STATE OF NORTH CAROLINA v. STEPHEN CHRISTOPHER HUNT

No. 8229SC1119

(Filed 20 September 1983)

1. Criminal Law § 75.2— confession—psychological coercion—continued interrogation after request for parents

Defendant's confession was the result of psychological coercion and was thus inadmissible in evidence where defendant was only sixteen years of age; from 10:30 in the morning when he was first picked up until approximately 4:30 in the afternoon, after he confessed, he only came in contact with police officers; though defendant repeatedly denied any involvement in the crimes, the police just as repeatedly told him they did not believe him and knew he was involved; defendant was given a voice stress test and was then told by several officers that the test showed he was lying; the officers told defendant that it would be easier on him if he told them about his involvement in the crimes; after defendant's repeated denials to white officers, his interrogators brought in a black officer who was not connected with the investigation of the case; this officer told defendant that he knew his father and that his father would want him to tell him about it; defendant asked for his mother, but did not get to see her before making the statement; and as he was waiting for his mother to come, the black officer told defendant that he was "wasting time." Furthermore, defendant's confession was improperly obtained for the additional reason that officers continued their interrogation of defendant after he stated that he did not want to answer further questions without his parents being present.

**2. Constitutional Law § 30 — denial of discovery requests — violation of right to fair trial**

   In a prosecution for murder, burglary and conspiracy to commit burglary in which the State's chief witness professed to recall the crimes and that defendant participated with him and two others in them only after undergoing hypnosis at the suggestion of the police, and in which the witness shortly thereafter underwent a court-ordered psychiatric evaluation, negotiated a plea, and received a recommendation of a light sentence, defendant's right to a fair trial was violated by the trial court's denial of his pretrial motions seeking to obtain (1) the written psychiatric evaluation; (2) an independent psychiatric examination of the witness; (3) disclosure of inducements to any prosecution witness or family of a witness; (4) disclosure of the full circumstances leading to the plea agreement; and (5) disclosure of the full circumstances leading to the witness's hypnosis.

APPEAL by defendant from *Seay, Judge*. Judgments entered 28 May 1982 in Superior Court, RUTHERFORD County. Heard in the Court of Appeals 13 April 1983.

The defendant, after trial, was found guilty of second degree murder, first degree burglary, and conspiracy to commit second degree burglary.

At approximately 10:45 o'clock on the morning of January 8, 1982, the pajama-clad body of 88-year-old Nannie Newsome was found lying face down in the yard immediately behind the building next door to where she lived. The distance between Ms. Newsome's body and her house was approximately 175 yards. Ms. Newsome lived alone. There is a ball field located about a hundred yards or more behind her house.

Police were called to the scene and arrived shortly thereafter. Upon their investigation of the scene, the police found that Ms. Newsome's house consisted of three levels, an upstairs, a downstairs and a basement. There was a screened porch in back of the house. The police discovered that the screen was torn back from the top and was falling down, with the bottom pushed out. They found one tennis shoe print in the dust and dirt in the basement. The dust and dirt had been tracked up the steps, the rear door was standing open, and the lock had been busted on it. Portions of the lock and the wooden portions of the door were lying inside the kitchen area of Ms. Newsome's house. The front door was locked.

Upon examination of the ball field behind the house, investigating officers discovered other footprints in the ball field. However, there were no footprints discovered between the house and the ball field. The prints in the ball field were of a tennis shoe and a barefoot print. The prints were found approximately 300 yards from Ms. Newsome's body.

The investigating officers processed the scene and lifted several fingerprints from inside of the house, including prints from the wooden door which had been knocked in. A plaster cast was made of the footprint found in the basement. An examination of the prints in the ball field revealed that there were two sets of footprints in the ball field, one belonging to a barefoot person, the other belonging to a person with tennis shoes on. The officers determined that the barefoot prints were those of Ms. Newsome, based upon a deformity in the toe print which was similar to her toe. The tennis shoe print in the ball field appeared to be similar to the tennis shoe print found in the basement of the house.

The plaster cast of the tennis shoe print and the fingerprint lifts were all submitted to the State Bureau of Investigation laboratory for analysis. In addition, hair fibers found on a sheet which covered Ms. Newsome's body, hair fibers from her body, and hair fibers from several suspects were also submitted for analysis.

The autopsy report confirmed that there were superficial cuts and bruises on the face, torso, arms, legs and lower extremities and feet of the body. There were tears in the vaginal canal and bruises in the vaginal area. In the opinion of the medical examiner, Ms. Newsome died from a heart attack during strangulation and sexual assault.

The investigating officers began questioning people in the surrounding community. Among those questioned were Otis Forney and his brother, Maurice Forney. Upon initial questioning, both Forney brothers denied any knowledge of any events at Ms. Newsome's house during the morning of January 8. However, the SBI laboratory analysis revealed that the hair fibers lifted from the sheet which covered Ms. Newsome were microscopically consistent with Otis Forney's head hair.

The police questioned Maurice Forney after Otis Forney was questioned. He continued to assert that he had no knowledge of

any events at Ms. Newsome's house. For a period of approximately two weeks after Ms. Newsome's body was found, Maurice Forney knew nothing of the details of her death.

After Forney had been questioned several times by the police, he took a polygraph examination. After that, someone convinced him that he was not telling the truth. Thereafter, he agreed to submit to hypnosis. He was hypnotized on two separate occasions and was asked questions about Ms. Newsome's death while under hypnosis. It was while under hypnosis that Maurice Forney first imagined that he was at Ms. Newsome's house on January 8th and had knowledge of the details of Ms. Newsome's death and imagined that he was involved. While under hypnosis, he thought that Lester Flack had come to his house and took him on his shoulder a mile up the road to Stephen Hunt's house and a mile back down the road to Nannie Newsome's house. After undergoing hypnosis, Forney implicated himself, Stephen Hunt, Lester Flack and Richard Flack.

Forney claimed to be an unwilling participant in a break in to the Newsome home and a physical and sexual assault upon Ms. Newsome during the early morning hours of January 8th. He testified that Lester Flack had come to his house and gotten him, and then had gone by Stephen Hunt's and gotten him, and the three of them had gone to Ms. Newsome's house.

Soon after the police obtained Maurice Forney's statement, members of the Rutherford County Sheriff's Department went to the school where Stephen Hunt was enrolled, picked him up, and took him to the Sheriff's Department for questioning. He was questioned there for several hours, at the end of which he made an oral statement implicating himself, Forney and the Flack brothers in a break in of Ms. Newsome's house and an assault upon her.

At the time defendant made his statement, he was sixteen years old, living at home with his parents, had requested their presence, had been told they were coming, but was wasting time by waiting on them. Immediately after he made the oral statement, he was asked to make a signed statement and to record the statement. He refused to do either one. Shortly afterwards, he was taken to the jail, where he wrote out a statement repudiating the oral statement that he had made.

Defendant testified that on the night of January 7th and through the morning of January 8th, he was at home with his mother and father. This testimony was corroborated by both his mother and father.

None of the physical evidence from the scene was in any way connected with Stephen Hunt.

*Attorney General Edmisten, by Special Deputy Attorney General John R. B. Matthis and Assistant Attorney General John F. Maddrey, for the State.*

*Chambers, Ferguson, Watt, Wallas, Adkins & Fuller, by James E. Ferguson, II, for defendant appellant.*

PHILLIPS, Judge.

[1]  We are obliged to hold that defendant's confession was improperly received in evidence against him. The record reveals that it was obtained in violation of his right against self-incrimination under the Fifth and Fourteenth Amendments to the United States Constitution. Though no physical force was involved, the circumstances recorded nevertheless indicate a coercively obtained, rather than a voluntarily given, statement, and though a *Miranda* warning was given at the beginning of the interrogation, the record shows beyond question that his rights were thereafter violated when the police continued their interrogation and obtained the statement after the inexperienced and youthful defendant told them he did not want to answer any more questions until his parents arrived.

This case is controlled by *Miranda v. Arizona,* 384 U.S. 436, 16 L.Ed. 2d 694, 86 S.Ct. 1602 (1966). *Miranda* bars the use of statements stemming from custodial interrogation of the defendant if strict procedural safeguards are not met. *Id.* at 444. "Custodial interrogation" means questioning initiated by the police "after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* North Carolina has adopted an objective test of "custodial interrogation" that asks whether a reasonable person would believe under the circumstances that he was free to leave. *State v. Perry,* 298 N.C. 502, 259 S.E. 2d 496 (1979). In the present case, the duration and location of the questioning, the number of police in-

volved, the defendant's youth and inexperience, and his request for his parents all indicate that defendant had no idea at all that he was free to leave, but rather believed that he was subject to the control of the officers and acted accordingly.

From 10:30 in the morning when he was first picked up until approximately 4:30 in the afternoon, after he had made his statement, he only came in contact with police officers. He did not see his parents, a lawyer, or other friendly adult. Though he repeatedly denied any knowledge of or involvement in the crime, the police just as repeatedly told him they did not believe him and knew he was involved. He was given a voice stress test and then told by several officers that the test showed he was lying. The officers told him that it would be easier on him if he told them about his involvement in the crime and that he would be wise to tell them about it. After his repeated denials to white officers, his interrogators brought in a black officer who was not connected with the investigation of the case. This officer told him that he knew his father and that his father would want him to tell him about it. A white officer had previously told him that if he were his son, he would tell him to go ahead and tell about it. The defendant asked for his mother, but did not get to see her before making the statement. As he was waiting for his mother to come, the black officer told him that he was "wasting time." Thus, not only was the interrogation "custodial," it was also psychologically coercive.

But even if that was not the case, it is clear that the defendant's statement was improperly obtained for another *Miranda* reason. Although defendant was initially given the required *Miranda* warnings, the police failed to respect his constitutional rights after he stated he did not want to answer further questions without his parents being present. Continuing with their interrogation, as they admittedly did, notwithstanding his request to the contrary, was a clear and direct violation of *Miranda, supra,* at 473-74:

If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be

other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.

Upon retrial, therefore, the statement obtained from defendant during the custodial interrogation cannot be used in evidence against him.

[2] With considerable justification, the defendant contends that his rights to a fair trial were also violated by several rulings of the trial court that unduly shielded the witness Maurice Forney from defendant's scrutiny and inquiry. A more justifiable basis for a defendant on trial for grave felonies being allowed wide latitude in discovering the mental status of a prosecuting witness, and how he came to be one, can scarcely be imagined. No physical evidence connected defendant with the crime and Forney was the main witness against him; but, according to the record, for two weeks after the crime, Forney truthfully maintained to the officers that he knew nothing whatever about the crime and was not involved in it. After undergoing hypnosis at the suggestion of the police, however, Forney professed to recall the crime and that defendant participated with him and several others in it; and shortly thereafter, he underwent a court-ordered psychiatric evaluation, negotiated a plea, and a light sentence was recommended for him. Obviously, information bearing upon Forney's mental and emotional stability, why hypnosis was needed to re-activate his memory, how he came to agree to it, and the circumstances that led to the plea bargain was essential to defendant's case and should have been made available to him upon request.

In pretrial motions, defendant sought to obtain (1) the written psychiatric evaluation; (2) an independent psychiatric examination of Forney; (3) disclosure of inducements to any prosecution witness or family of a witness; (4) disclosure of the full circumstances leading to the plea agreement; and (5) disclosure of the full circumstances leading to hypnosis. Each motion was denied, erroneously so, in our opinion.

The court apparently withheld the psychiatric evaluation report under the mistaken impression that it was required to do

so by statute. Though the examination was made for the purpose of establishing Forney's capacity to plead to the indictment against him pursuant to the provisions of G.S. 15A-1002, and that statute does require the hospital to give copies of its report only to the court and the examinee, it expressly authorizes the court to handle its copy as it sees fit and to reveal its contents to others under such conditions as are deemed appropriate. But even if the statute required that Forney's privacy be kept inviolate, since he had negotiated a plea and his fair trial rights were no longer involved, it would have to yield to the superior constitutional rights that are here involved. *Davis v. Alaska*, 415 U.S. 308, 39 L.Ed. 2d 347, 94 S.Ct. 1105 (1974); *Chambers v. Mississippi*, 410 U.S. 284, 35 L.Ed. 2d 297, 93 S.Ct. 1038 (1973).

This case is similar to and governed by *Chavis v. North Carolina*, 637 F. 2d 213 (4th Cir. 1980). In that case the trial court granted the motion for production of a psychiatric report of a prosecuting witness, but the State failed to provide the defendant with a copy. In holding that the defendant's due process rights were violated, the Court noted, however, that the report, which was in the record, contained information helpful to defendant. The State attempts to distinguish *Chavis* from this case for that reason, pointing out that the defendant has not shown that he has been prejudiced by his failure to obtain the report. Yet the defendant did move that the report be sealed and included in the record for appellate review, but the trial judge refused to do so, which was error. *State v. Hardy*, 293 N.C. 105, 128, 235 S.E. 2d 828, 842 (1977). Since defendant's only means of showing prejudice was erroneously barred by the trial court, prejudice is assumed.

The record reveals no reason for denying defendant's request for an independent psychiatric examination of Maurice Forney, and none was given. This witness was able to testify only through the aid of hypnosis, which on its face raised legitimate questions as to the witness's mental reliability, stability, and suggestibility—questions requiring qualified scientific appraisal, not only for the enforcement of defendant's due process rights, but also for the guidance of the court and jury in assessing such bizarre circumstances. The record contains no indication that Forney was unwilling to be examined again, but even if he was, since he and the State opened the psychiatric door by resorting to hypnosis, they cannot close it to the defendant without imping-

ing upon his constitutional rights to a fair trial, which, under these unusual circumstances, can be protected only in this way. For similar reasons, the other information requested by defendant in the several motions referred to should have been furnished.

This matter is returned to the Superior Court for a new trial in accord with this opinion.

New trial.

Judges HILL and JOHNSON concur.