STATE OF NORTH CAROLINA v. DANIEL ANDRE GREEN, A.K.A. AS-SADDIQ AL-AMIN SALLAM U'ALLAH

No. COA97-274

(Filed 2 June 1998)

### 1. Evidence and Witnesses § 2864 (NCI4th)— cross-examination—accomplice—State's witness—interrogation—officer's threatening remark

A murder defendant's right to cross-examine his accomplice to show fear and coercion in testifying against defendant was not violated by the trial court's refusal to permit defendant to cross-examine the accomplice about a remark allegedly made by an officer during the interview in which the accomplice implicated defendant that defendant "can't be guilty of the heinous crime if what he said is true, if all he did was help dump the body in the river. . . . But he sure shoved that needle up your rear end," where defendant cross-examined the accomplice for several days, giving the jury the opportunity to observe manifestations of any nervousness or fear; the circumstances of the accomplice's interrogation and statements similar to the remark in question were placed into evidence; the accomplice repeatedly testified on cross-examination by defendant that he had not been intimidated during interrogation; and defendant had the opportunity to question the policemen about how they conducted the interrogation.

### 2. Criminal Law § 406 (NCI4th Rev.)— instruction—disregard of closing argument—not expression of opinion

The trial court's instruction that the jury in a murder trial should disregard any contention by defense counsel in his closing argument that there had been any fabrication of evidence in the case did not in effect tell the jury to accept at face value the testimony of defendant's accomplice, a key State's witness, and was not an improper expression of opinion on the evidence.

### 3. Evidence and Witnesses § 1235 (NCI4th)— interrogation—defendant not in custody—Miranda warnings not required

Defendant was not in custody during seven hours of interrogation at the sheriff's department prior to his arrest, and his statements made during that time were admissible in his murder trial even though *Miranda* warnings had not been given to him, where

defendant willingly accompanied officers to the sheriff's department; officers told defendant at the outset and again later that he was not under arrest; defendant was not handcuffed or restrained in any way; officers showed defendant the location of the restroom and lounge and offered him food and beverages; defendant had a calm and cooperative demeanor and did not appear to be under the influence of an intoxicating substance; officers asked defendant at the conclusion of his initial remarks if he was "doing all right" and he responded that he was "all right"; defendant was given breaks and coffee; defendant was not guarded or accompanied by any officer when he used the restroom during one break; and officers did not attempt to perform invasive procedures during defendant's interrogation.

**4. Constitutional Law § 266 (NCI4th)— right to counsel— defendant's waiver of conflict-free counsel—third-party attorney—appointment to confer with defendant**

The trial court did not deny defendant his constitutional right to counsel by intervening between him and his attorneys when one of defendant's attorneys decided not to pursue a line of impeachment questioning of a witness to eliminate the possibility that the attorney would have to testify and withdraw from the case where the court gave defendant and his attorneys an opportunity to confer about the matter; the court questioned defendant as to whether defendant understood his attorney's decision to abandon the line of impeachment questioning; the court then appointed a third-party attorney to consult independently with defendant; the court questioned the third-party attorney and defendant as to whether defendant was making a knowing, intelligent and voluntary waiver of his right to conflict-free counsel; and the trial court determined that defendant did in fact make such a waiver.

**5. Constitutional Law § 266 (NCI4th)— right to counsel— waiver of mistrial—third-party attorney—appointment to confer with defendant**

The trial court did not deny defendant his right to counsel by appointing a third-party attorney to consult with defendant to ensure that he understood his rights when defendant indicated that he did not want a mistrial after his attorneys moved for a mistrial because of the prosecutor's reference to defendant's decision not to testify.

**6. Evidence and Witnesses § 437 (NCI4th)— pretrial photographic identification—not impermissibly suggestive**

A robbery and shooting victim's pretrial identification of a murder defendant in a photographic lineup was not impermissibly suggestive and did not taint his identification of defendant in the murder trial even though the victim told police while he was in the hospital recovering from gunshot wounds that he could not identify the robbers "if they walked in here."

**7. Evidence and Witnesses § 485 (NCI4th)— pretrial photographic identification—independent origin of in-court identification**

The evidence supported the trial court's determination that a witness's in-court identification of a murder defendant as the person who robbed and shot him a month before the murder was of independent origin from the witness's pretrial photographic identification of defendant where the evidence tended to show that the store where the robbery occurred had two windows and overhead lighting; the witness had been one to two feet from defendant during the robbery and shooting and his attention was focused primarily on defendant; he had not made any identification of any other person during any pretrial identification procedures; the witness gave a generally accurate description of defendant shortly after the crime; the witness stated that defendant looked "just like" the man who robbed him; and the time lapse between the robbery and the pretrial identification procedure was not so long as to diminish the witness's ability to make a reliable identification.

Judge HORTON dissenting.

Appeal by defendant from Gregory A. Weeks, Judge. Judgment entered 12 March 1996 in Superior Court, Robeson County. Heard in the Court of Appeals 23 February 1998.

*Michael F. Easley, Attorney General, by Assistant Attorney General Gail E. Weis, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Assistant Appellate Defender Janine Crawley Fodor, for defendant appellant.*

SMITH, Judge.

Defendant was convicted in February 1996 of first-degree murder felony, robbery with a dangerous weapon and conspiracy to commit robbery and was sentenced in March 1996 to life imprisonment plus ten years. The State's evidence in this case tends to show that the victim, James Jordan, had been sleeping in his Lexus automobile by a highway in Robeson County, North Carolina, in the early morning hours of 23 July 1993. Defendant and his friend, Larry Demery, approached the car, fatally shot Mr. Jordan and dumped his body off a bridge in an area known as Gum Swamp in Marlboro County, South Carolina. After dumping the body, defendant and Demery used the cellular telephone in the car, drove the car to a number of locations, showed the car to a number of people and displayed distinctive jewelry taken from Mr. Jordan's body and items taken from the car. By the use of cellular telephone records, authorities began to develop evidence that led them to defendant and Demery. The two were charged with murder and other offenses in August 1993. Defendant was convicted following a jury trial in which Demery testified for the State.

In this appeal, defendant made numerous assignments of error. We examine those brought forward in his brief. All other assignments of error are deemed to have been abandoned pursuant to the North Carolina Rules of Appellate Procedure, Rule 28(a).

[1] Defendant first asserts that the trial court erred by preventing him from cross-examining Larry Demery about remarks made by law enforcement officers to Demery during Demery's interrogation. Specifically, defendant asserts that the trial court erroneously stopped him from asking Demery about alleged threats made by police during the interview in which Demery implicated defendant in James Jordan's death. This argument is without merit.

The trial transcript shows that defendant's attorneys cross-examined Demery at length about the circumstances of the initial interrogation that followed Demery's arrest in August 1993. During cross-examination, in the jury's presence, Demery testified that: He was interrogated with up to eight or nine officers present at one time; the interrogation lasted roughly nine hours; none of Demery's friends or family members was present; several officers interrogated him at one time and used profanity; the officers made statements indicating he would face lighter charges and punishment if he made a statement and would face harsher charges and punishment, including the death

penalty, if he did not make a statement; he was "scared" about "all these charges"; the officers told him he could not get a fair trial because of the identity of the victim; and the presence of an FBI agent made him think that he might face federal as well as state charges. Demery also testified he made a plea bargain with the State and had agreed to assist the State in obtaining a conviction against defendant. Demery testified that as part of the plea bargain, numerous charges against him were consolidated. While acknowledging he was "scared," Demery repeatedly insisted he was not "intimidated" by the officers who interrogated him. On at least four occasions during defendant's cross-examination of Demery, defense counsel asked Demery if he felt intimidated during the interrogation. In each instance, Demery said he had not been intimidated.

The litany of circumstances surrounding the interrogation and Demery's repeated denials of intimidation notwithstanding, defendant asserts the trial court erred when it sustained an objection during cross-examination of Demery as follows:

Q: And Mr. Demery, the person that broke you told you that "we're talking about first degree murder, capital, you understand. Capital, that's the needle up your ass, son, and you don't wake up from it. All right. Capital. You get a good prosecutor that wants to push it, son, I'm talking capital, all right. Let this man shove it up your ass." Is that the person that broke you?

A: No, the person who said that was a little—I don't remember his name, but he was a little short bald-headed guy with a smart mouth, but that's not the same person.

Q: The person that broke you, Mr. Demery, did he tell you that, "See, Larry, Daniel can't be guilty of the heinous crime if what he said is true, if all he did was help dump the body in the river. Everything he did according to him was after Mr. Jordan was dead, not before. He can't be guilty of a heinous crime. But he sure shoved that needle up your rear end," is that the person who broke you who said that?

Mr. Britt [for the State]: Objection, move to strike.

The trial court sustained the objection on the grounds that the question was based on hearsay and, therefore, admissible only to impeach the officer who allegedly made the statement. Defendant contends this was error because he should have been permitted to "confront" Demery with these specific words: "See, Larry, Daniel

can't be guilty of the heinous crime if what he said is true, if all he did was help dump the body in the river. . . . He can't be guilty of a heinous crime. But he sure shoved that needle up your rear end." Defendant contends such a confrontation would have enabled him to "test," in the presence of the jury, how the statement "affected" Demery. Defendant argues that if Demery had been "shaken" by a repetition of the detective's distasteful remarks during the cross-examination, the jury would have seen not only that Demery was intimidated during the initial interrogation but that he was still scared and he was still trying to save himself by testifying against defendant.

We reject this argument for several reasons: One, defendant cross-examined Demery over a period of several days, giving the jury ample opportunity to observe Demery's demeanor, including any manifestations of nervousness or fear. Two, the circumstances of the initial interrogation and statements very similar to the one in question came into evidence, giving the jury the opportunity to gauge how such circumstances and remarks might affect someone in Demery's position. Three, defendant repeatedly asked Demery whether he had been intimidated during the interrogation, and Demery repeatedly said, "No." Four, defendant had the opportunity to question the investigators about how they conducted the interrogation of Demery.

We recognize that "[c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316, 39 L. Ed. 2d 347, 353 (1974). We also note, however, that "the trial judge, who sees and hears the witnesses and knows the background of the case, has wide discretion in controlling the scope of cross-examination." *State v. Hansley*, 32 N.C. App. 270, 273, 231 S.E.2d 923, 925 (1977) (citations omitted). In *Hansley*, this Court held that the trial court did not err in sustaining the State's objections where defendant attempted to cross-examine State's witness about statements made to her by others to show influence on her testimony. *Id.* As in *Hansley*, "[w]e perceive no abuse of discretion under the facts in this case." *Id.*

Finally on this point, we note defendant's argument that the trial court erred in characterizing the disputed question as hearsay. Defendant says he was not offering the distasteful statements for the truth of the statements but rather to test their effect on Demery. The State counters that defendant framed his question in such a way as to allege that the investigator made distasteful statements in an attempt to threaten and coerce Demery. In support of its position, the State

cites *State v. Yoes and Hale v. State*, 271 N.C. 616, 157 S.E.2d 386 (1967), in which our Supreme Court held that a defendant is not entitled to offer evidence of his own, "under the guise of cross examination, in the midst of the State's presentation of its case . . . ." *Id.* at 646, 157 S.E.2d at 409. We find this argument persuasive, particularly in light of the fact that defendant had the opportunity to question investigators about how they conducted their interrogation of Demery. If the trial court erred in sustaining the objection, the error was harmless beyond a reasonable doubt. Defendant had ample opportunity to cross-examine Demery, and distasteful remarks used by investigators during the initial interrogation of Demery were admitted in evidence. The trial court gave defendant full opportunity to cast doubt upon Demery's credibility and motivation. It was the jury's prerogative and province to draw its own conclusions.

[2] Defendant next contends he is entitled to a new trial because, he asserts, the trial court expressed an opinion on the evidence during defendant's closing argument.

"The judge may not express during any stage of the trial, any opinion in the presence of the jury on any question of fact to be decided by the jury." N.C. Gen. Stat. § 15A-1222 (1977).

> It is fundamental to our system of justice that each and every person charged with a crime be afforded the opportunity to be tried "before an impartial judge and an unprejudiced jury in an atmosphere of judicial calm." As the standard-bearer of impartiality the trial judge must not express any opinion as to the weight to be given to or credibility of any competent evidence presented before the jury.
>
> In evaluating whether a judge's comments cross into the realm of impermissible opinion, a totality of the circumstances test is utilized. "[U]nless it is apparent that such infraction of the rules might reasonably have had a prejudicial effect on the result of the trial, the error will be considered harmless."

*State v. Larrimore*, 340 N.C. 119, 154-55, 456 S.E.2d 789, 808 (1995) (citations omitted). Defendant bears the burden of establishing that the trial judge's remarks were prejudicial. *State v. Summerlin*, 98 N.C. App. 167, 174, 390 S.E.2d 358, 361, *disc. review denied*, 327 N.C. 143, 394 S.E.2d 183 (1990). In weighing whether an expression by the trial court prejudiced a defendant's case, our Supreme Court has taken into account the trial court's instructions as to its own impar-

tiality. *State v. Porter*, 340 N.C. 320, 330-31, 457 S.E.2d 716, 721 (1995).

In the case at bar, the trial court made the remarks in question in response to defendant's suggestion, during closing arguments, that the State had "problems" with certain evidence and improperly tried to "cure" them. The State objected to defendant's insinuation, and the trial court sustained the objection, saying,

> Members of the jury, you are to disregard any contention by counsel for defendant, Mr. Bowen, that there has been any fabrication of evidence in this case in any respect. There is absolutely no evidence to support that contention. That is improper, and you're not to consider that argument in any respect during your deliberations in this matter.

Defendant contends that, with those remarks, the trial court effectively instructed the jury to accept the testimony of Larry Demery, a key State witness, at face value. We disagree. The trial court did not mention Demery or make any reference to his testimony. Viewing the trial court's comments in the context in which they were made, and in the broader context of a trial that lasted roughly ten weeks and produced a transcript of more than 8,000 pages, we find no error. Furthermore, the trial court instructed jury members that they were the sole judges of the credibility of each witness and that they must decide for themselves whether to believe the testimony of any witness. The trial court also instructed the jury:

> Now, folks, the law as indeed it should, requires the presiding judge to be impartial. Therefore, I instruct you that you are not to draw any inference from any ruling that I have made. You are not to draw any inference from any inflection in my voice, any expression on my face, or any question that I may have asked the witness during the course of these proceedings, or anything else that I may have said or done as to whether or not I have any opinion of any kind or as to whether or not I have intimated any opinion of any kind, as to whether any of the evidence in this case should be believed or disbelieved, or as to whether any fact in this case has or has not been proved, or as to what your findings ought to be. It is your exclusive province to find the true facts of this case and to render a verdict reflecting the truth as you find it to be.

This assignment of error is without merit.

**STATE v. GREEN**

[129 N.C. App. 539 (1998)]

**[3]** Defendant next asserts that the trial court committed error by admitting in evidence statements defendant made to law enforcement during what defendant asserts was a custodial interrogation where no *Miranda* warnings were given.

Several officers went to defendant's home on 14 August 1993, and he voluntarily went with them to the Robeson County Sheriff's Department. The officers told defendant he was not under arrest. They did not read him his *Miranda* rights prior to questioning him throughout the night. In response to the questioning, defendant made many statements. These were used at trial to cast doubt on alibi testimony that defendant presented through a number of third-party witnesses. The question before us is whether defendant was in custody during the roughly seven hours of interrogation at the Robeson County Sheriff's Department prior to his arrest.

" 'Custodial interrogation' means questioning initiated by the police 'after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' " *State v. Hunt*, 64 N.C. App. 81, 85, 306 S.E.2d 846, 849, *disc. review denied*, 309 N.C. 824, 310 S.E.2d 354 (1983), quoting from *Miranda v. Arizona*, 384 U.S. 436, 444, 16 L. Ed. 2d 694, 706 (1966). "North Carolina has adopted an objective test of 'custodial interrogation' that asks whether a reasonable person would believe under the circumstances that he was free to leave." *Hunt* at 85, 306 S.E.2d at 849 (citation omitted). More recently, our Supreme Court noted that

> [t]he United States Supreme Court has held that in determining whether a suspect was in custody, an appellate court must examine all the circumstances surrounding the interrogation; but the definitive inquiry is whether there was a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest.

*State v. Gaines*, 345 N.C. 647, 662, 483 S.E.2d 396, 405 (citation omitted), *cert. denied*, 118 S.Ct. 248, 139 L. Ed. 2d 177 (1997). *Gaines* cited *Stansbury v. California*, 511 U.S. 318, 322, 128 L. Ed. 2d 293, 298 (1994).

The facts in this case related to custody are troubling to this Court. *Miranda* is the law of our land, and law enforcement officers throughout this State have long been on notice that sloppy or incompetent investigative practices put their cases and, ultimately, the pub-

lic at risk. That being said, we note that the trial court examined the circumstances of defendant's interrogation with great care. The trial court held a lengthy pretrial hearing on defendant's motion to suppress the statements in question. The hearing lasted from 4 October 1995 through 12 October 1995, included testimony from thirty witnesses and produced a transcript of more than 1,300 pages. Following the hearing, the trial court made extensive findings of fact and, based on those findings, concluded defendant was not in custody during the time in question and that his statements were admissible. Had we been the trial court, we might have made somewhat different findings or additional findings and ultimately might have reached a different legal conclusion on the question of custody. We acknowledge that this is a close case. However, after having scrutinized the record intensely, we conclude that competent evidence supports the trial court's findings of fact, and the findings of fact support the conclusions of law.

The trial court's findings include the following facts: When officers went to defendant's home on 14 August 1993, defendant willingly accompanied them to the Robeson County Sheriff's Department; officers told defendant at the outset that he was not under arrest; defendant was not handcuffed or restrained in any way; upon arrival at the sheriff's department, officers showed defendant the location of the restroom and lounge and offered him food and beverages; defendant had a calm and cooperative demeanor; officers again told defendant he was not under arrest; defendant stated on a tape recording he had voluntarily accompanied the officers to the sheriff's department for the interview; defendant did not appear to be tired; defendant did not appear to be under the influence of any intoxicating substance; at the conclusion of defendant's initial remarks, officers asked defendant if he was "doing all right," and defendant responded he was "all right"; officers asked defendant if he wanted anything to drink or wanted to use the restroom; defendant had breaks at approximately 10:30 p.m. and 11:50 p.m.; during one of the breaks he telephoned his mother to tell her he would be home late; defendant used the restroom during one of the breaks and was not guarded or accompanied by any officer; officers gave defendant coffee on one occasion and offered it on other occasions; defendant had at least two more 20-30 minute breaks between the 11:50 p.m. break and 4:15 a.m.; up until 4:45 a.m., defendant was not handcuffed or guarded; at approximately 4:45 a.m., officers told defendant he was not free to leave and advised him of his *Miranda* rights.

The trial court's findings and other parts of the record also make clear that the interrogation was not a coffee klatch. For most of the interview, defendant was in a 20-by-20-foot room with four officers, three of whom were visibly armed. As defendant gave changing accounts of what occurred on the night of James Jordan's death, the officers became frustrated with him, telling him repeatedly they were certain he was not telling the truth. One officer told defendant he was "running out of time"; one told him the accounts he was giving were "all lies"; one told him to "come clean"; and one told him he was "hurting himself by the lies." While these facts suggest that defendant was not necessarily in a comfortable situation, they do not indicate he was in custody.

The U.S. Supreme Court has recognized that

[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody."

*Oregon v. Mathiason*, 429 U.S. 492, 495, 50 L. Ed. 2d 714, 719 (1977).

We have examined all of the circumstances, as required under *Gaines* and *Stansbury*. Having done so, and giving appropriate deference to the trial court's findings, we conclude the trial court did not err in determining that defendant was not in custody, and the statements he made prior to his arrest were admissible.

In coming to this conclusion, we are aware of our Supreme Court's decision in *State v. Jackson*, 348 N.C. 52, 497 S.E.2d 409 (1998), and we think that case is readily distinguishable from the case before us. In *Jackson*, our Supreme Court addressed whether the defendant was in custody at the time he made incriminating statements. The evidence in *Jackson* showed that defendant Jackson voluntarily accompanied two sheriff's deputies to the sheriff's department. It further showed that

[w]hile at the sheriff's office, the defendant consented to finger-printing and gave blood and hair samples. He was under constant supervision. The defendant had told the officers he was anxious to return to work, and despite answering all questions from them and telling them he had no knowledge of the crime, he was never told that he was free to leave or that he would be given a ride to his home or place of work if he decided to leave.

After being in the interrogation room for a period of approx-imately three hours, during which time he was questioned by the officers in regard to the murder, had hair and blood samples taken, and was fingerprinted, a reasonable man at the least would have wondered whether he was free to leave. When the sheriff asked him what he had done with the rifle he had used to kill the victim, this informed the defendant that the sheriff thought he had committed murder.

*Jackson*, 348 N.C. at 55, 497 S.E.2d at 411. Based on that evidence, our Supreme Court concluded that "[a] reasonable man in the defendant's position who had been interrogated for approximately three hours and thought the sheriff believed he had committed murder would not have thought he was free to leave. He would have thought the sheriff intended to hold him for prosecution for murder." *Id.* Thus, our Supreme Court held that Jackson was in custody.

*Jackson* is distinguishable from the case before us in several ways. Primary among them is that the trial court in *Jackson* made no findings of fact as to whether defendant Jackson was in custody. In the case at bar, the trial court, as noted above, held a lengthy pretrial hearing on the question of custody, made extensive findings of fact and concluded defendant was not in custody during the time in ques-tion. The trial court's findings are supported by the record, and we are bound by them.

Further distinguishing *Jackson*, defendant Jackson invoked his right to counsel during his interrogation, but the sheriff continued to talk to him, and defendant Jackson made incriminating statements after having invoked his right to counsel. In the case at bar, defend-ant Green never invoked his right to counsel, and the statements he made were not, on their face, inculpatory on the charge of murder.

Finally, during Jackson's interrogation, officers requested and received Jackson's consent to being searched and to having finger-prints and blood and hair samples taken. These are invasive proce-dures and certainly could give an individual the impression he was in

custody. Officers did not attempt to perform invasive procedures during defendant Green's interrogation. Looking at all these factors, we conclude that our Supreme Court's decision in *Jackson* does not govern the case before us because of the factual differences in the two cases.

Defendant Green also asserts that the trial court denied him his constitutional right to counsel by intervening between him and his attorneys on four occasions and by requiring him to make trial decisions independently of his attorneys. This argument is unpersuasive.

**[4]** Defendant first cites an occasion during trial in which one of defendant's attorneys had to decide whether to pursue a line of impeachment questioning with a particular witness. Pursuing the questioning could have required the attorney himself to testify and thus could have created the possibility that the attorney would have to withdraw from the case. Defendant's attorney decided not to pursue the line of questioning, eliminating the possibility that he himself might have to testify. The trial court quickly recognized the situation created a conflict of interest in that the defense attorney had to forfeit defendant's ability to pursue certain impeachment testimony or risk the attorney's ability to continue representing the defendant.

"The trial judge must meet situations as they arise and to do this must have broad power to cope with the complexities and contingencies inherent in the adversary process." *Geders v. United States*, 425 U.S. 80, 86, 47 L. Ed. 2d 592, 598 (1976). "If the possibility of conflict is raised before the conclusion of trial, the trial court must 'take control of the situation.' " *State v. James*, 111 N.C. App. 785, 791, 433 S.E.2d 755, 758, (1993) (citations omitted). "[T]he trial judge should see that the defendant is fully advised of the facts underlying the potential conflict and is given the opportunity to express his or her views." *James* at 791, 433 S.E.2d at 759 (citation omitted). "Finally, it should be noted that the Sixth Amendment right to conflict-free representation can be waived by a defendant, if done knowingly, intelligently and voluntarily." *James* at 791-92, 433 S.E.2d at 759 (citations omitted).

In the case at bar, the trial court gave defendant and his attorneys an opportunity to confer on the matter; it then questioned defendant in detail twice (before and after a lunch break) as to whether defendant understood the situation and his attorney's decision to abandon the line of impeachment questioning; the trial court informed defendant he had a right to "the independent judgment of an attorney or

attorneys free of any possible conflicts of interest"; the trial court appointed a third-party attorney to consult independently with defendant; and the trial court specifically instructed the third-party attorney to inquire into whether defendant's waiver of his right to conflict-free counsel was knowing, intelligent and voluntary under Rule 5.2 of the North Carolina Rules of Professional Conduct. After defendant had an opportunity to consult with the third-party attorney, the trial court questioned that attorney and again questioned defendant as to defendant's understanding of the situation and as to whether defendant was making a knowing, intelligent and voluntary waiver of his right to conflict-free counsel who could pursue all potential avenues of impeachment. The trial court then held that defendant knowingly, intelligently and voluntarily waived his right. We hold that the trial court handled the situation appropriately.

**[5]** Defendant also cites another occasion during trial in which the trial court appointed a third-party attorney to consult with defendant to ensure he understood his rights. On that occasion, during closing remarks, the State made reference to defendant's decision not to testify on his own behalf. Defendant's attorneys moved for a mistrial, but defendant indicated to the trial court he did not want a mistrial. Here, too, the trial court provided defendant with third-party counsel before concluding that defendant had voluntarily waived his right to a mistrial. In *State v. Ali*, 329 N.C. 394, 407 S.E.2d 183 (1991), our Supreme Court cited with approval a holding by this Court that "tactical decisions, such as which witnesses to call, 'whether and how to conduct cross-examinations, what jurors to accept or strike, and what trial motions to make are ultimately the province of the lawyer . . . .' " *Ali* at 404, 407 S.E.2d at 189 (citations omitted). The *Ali* court added, however, that "when counsel and a fully informed criminal defendant client reach an absolute impasse as to such tactical decisions, the client's wishes must control; this rule is in accord with the principal-agent nature of the attorney-client relationship." *Id.* Again, we find no error by the trial court.

Defendant cites two other instances in which the trial court in its discretion questioned defendant to satisfy itself that he concurred with decisions by his attorneys. In these instances, too, the trial court appeared to be trying to ensure that defendant understood the circumstances and his rights.

We reject defendant's contention that the trial court improperly forced a form of hybrid representation on defendant. Defendant cites

*State v. Thomas*, 331 N.C. 671, 417 S.E.2d 473 (1992). *Thomas* holds that a defendant may not appear both *pro se* and by representation of counsel. Defendant in this case did not at any time appear *pro se*. He was represented by counsel at all times, and on two occasions third-party counsel was provided to him to ensure that he understood his rights.

The defendant also argues that, as a result of these four occasions, the trial court undermined defendant's confidence in his attorneys and eroded the attorney-client relationship, thereby denying defendant effective counsel. The record simply does not support this argument. In the trial court's discussions with defendant regarding impeachment testimony and his attorney's potential conflict of interest, for example, defendant indicated he would like to consult with third-party counsel, but he added, "I just want to make it clear it's not because of any lack of trust of my attorneys."

We find no error.

**[6]** Finally, defendant asserts the trial court erred by permitting the pretrial and in-court identifications of defendant by witness Clewis Demory. Defendant contends the pretrial identification procedure was impermissibly suggestive and that it tainted the in-court identification.

Witness Demory had been robbed and shot in July 1993 while working as a clerk in a convenience store in Robeson County. During that incident, the robbers had stolen a handgun, a blue steel .38 caliber Smith & Wesson with brown grips, that Demory kept in the store for protection. During the investigation of the incident, Demory described one of the robbers as a young, black male and gave a description of his stolen gun. Approximately one month later, in mid-August 1993, officers investigating the murder of James Jordan conducted a search of defendant's home and found a handgun matching the description of Demory's weapon. For that reason and others, SBI agent Tony Underwood prepared a photo lineup of eight photographs, including one of defendant, to show to Demory. Demory viewed the photo lineup 13 September 1993 and selected the photo of defendant, saying the individual in the photo looked like one of the two men who had robbed him.

Defendant contends that the photo identification was impermissibly suggestive. Defendant points to *voir dire* testimony in which Demory acknowledged that when police first questioned him in July

1993 while he was in the hospital recovering from gunshot wounds, he told them that he could not identify the robbers "if they walked in here." Defendant also points to *voir dire* testimony by Agent Underwood to the effect that prior to showing Demory the photo lineup in September 1993, Underwood asked Demory if he had seen any of the television news coverage of the arrests of defendant and Larry Demery in the murder of James Jordan. Underwood testified that Demory said he had seen television reports and he was not sure whether defendant and Demery were the two who robbed him. Underwood testified that Demory told him the black male he had seen in television reports looked like the black male who shot him during the robbery. Underwood then showed Demory the photo lineup, and Demory selected the photo of defendant. The trial transcript also shows that during his *voir dire* testimony, Underwood testified that during the September 1993 interview, Demory described one of the robbers as a black male, approximately six feet tall and weighing 140-145 pounds, in his early 20s and wearing a dark colored ball cap, long pants and a shirt. During defendant's trial, Demory testified that the young black male who robbed him "looked just like" defendant.

**[7]** The trial court rejected defense motions to suppress both the photo lineup and in-court identification. The trial court found that the pretrial identification procedure was not so impermissibly suggestive as to violate defendant's right to due process of law and found that even if impermissibly suggestive, the pretrial identification procedure was reliable and did not produce a substantial likelihood of misidentification. The trial court also determined that the in-court identification of defendant by Demory was of independent origin, based on what Demory saw at the time of the robbery in July 1993, and was not tainted by an impermissibly suggestive pretrial identification procedure.

Our Supreme Court has held that

> Identification evidence must be suppressed on due process grounds where the facts show that the pretrial identification procedure was so suggestive as to create a very substantial likelihood of irreparable misidentification. The first inquiry when a motion is made to suppress identification testimony is whether the pretrial identification procedure is impermissibly suggestive. If it is determined that the pretrial identification procedure is impermissibly suggestive the court must then determine

whether the suggestive procedure gives rise to a substantial likelihood of irreparable misidentification. Factors to be considered in making this determination are (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the criminal, (4) the level of certainty demonstrated at the confrontation, and (5) the time between the crime and confrontation.

*State v. Powell*, 321 N.C. 364, 368-69, 364 S.E.2d 332, 335, *cert. denied*, 488 U.S. 830, 102 L. Ed. 2d 60 (1988) (citations omitted).

In its conclusions, the trial court addressed each of the five factors set out in *Powell* at 369, 364 S.E.2d at 335. It found that: Demory had ample opportunity to observe the physical characteristics of defendant; Demory's attention was focused primarily on defendant during the robbery; Demory gave a generally accurate description of defendant shortly after the crime; Demory's level of certainty, "while not entirely unequivocal," was such that Demory stated that defendant looked "just like" the man who robbed him; and the time lapse between the crime and the pretrial identification procedure was not so long as to diminish Demory's ability to make a strong and reliable identification.

Prior to stating its conclusions, the trial court noted, among other things, that: The store where the robbery occurred had two windows and overhead lighting; Demory had been one to two feet from the black male robber during the robbery and shooting; Demory was wearing his glasses during the incident and his vision was 20/20 with his glasses; and Demory had not made any identification of any other person during any pretrial identification procedures.

Upon a careful review of the record, and giving deference to the trial court's opportunity to observe the witnesses, we find sufficient evidence to support the trial court's findings and conclusions regarding the pretrial and in-court identifications.

No prejudicial error.

Judge EAGLES concurs.

Judge HORTON dissents.

Judge HORTON dissenting.

I respectfully dissent from the conclusion of the majority that "the trial court did not err in determining that defendant was not in custody, and the statements he made prior to his arrest were admissible."

Defendant, eighteen years old at the time, was interrogated for some seven hours at the Robeson County Detention Center as a suspect in the murder and robbery of James Jordan, father of basketball superstar Michael Jordan. Officers told defendant he was not under arrest, and defendant voluntarily accompanied the officers to the Center. Defendant also consented to the search of his bedroom in his mother's home. Four police officers were present during the interrogation, three of whom were visibly armed. The site of the interview was moved from a large conference room to a smaller 20-by-20-foot room which contained three desks, a number of chairs, a telephone and a wall unit used as a post office. At no time during the interview was defendant represented by counsel, nor was he advised at any time of his right to remain silent pursuant to *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966).

Defendant gave numerous contradictory statements to the officers, but denied any involvement in the murder of James Jordan. The officers continued to question defendant, telling him that he was not telling the truth, he was "running out of time," he needed to do the "right thing," and he needed "to change his path . . . and head the other way." When defendant expressed concern that he had been "set up" for the murder and would be killed in jail to eliminate him as a witness, the officers told him that, if he were to be killed or hurt in jail, it would be because the victim was James Jordan. One or more officers told defendant that Michael Jordan was "the American Hero," and that "everybody loves Michael." After repeatedly telling defendant he was not telling the truth, the officers told defendant they believed that either he or suspect Larry Demery had killed James Jordan. Later in the interview, one of the officers told defendant he believed that defendant had killed James Jordan. During the lengthy interview process, there were several breaks and defendant was allowed to go to the rest room. Defendant was given coffee and asked if he was "doing all right." After the second break, the officers stopped tape recording the interview.

Although defendant was calm at the beginning of the extended interview, the officers commented later in the interview that defend-

ant was "shaking to death" and that he should "come clean," tell the truth, and get it off his chest. Defendant was told several times that he was not under arrest, but he was never told he could leave the police station, or that anyone would provide him transportation back to his home. When defendant wanted to call his mother and tell her he would not be coming home because the officers believed he had killed someone, the officers told defendant they only wanted him to tell the truth. Later, defendant called his mother and told her he would be home late. At 4:45 a.m., defendant was told he was not free to leave, and was advised of his *Miranda* rights. Defendant then said he did not want to talk to the officers anymore and he wanted a lawyer.

The able trial court made numerous findings of fact and concluded that defendant was not "in 'custody' *when he accompanied Special Agent Meyers and Captain Binder from his residence to the Robeson County Detention Center.*" (Emphasis added.) The question before us, however, is whether defendant was in "custody" during his lengthy interrogation at the Detention Center. The trial court concluded that "a reasonable person in the defendant's position would not have felt that he was under arrest or otherwise deprived of his freedom under the facts presented." The trial court also concluded that defendant's statements were made "freely, voluntarily, and understandingly."

In North Carolina, we have adopted an objective test to determine whether a suspect is in custody. "A suspect is in custody when, considering the totality of circumstances, a reasonable person in the suspect's position would not feel free to leave. 'This test is necessarily an objective one to be applied on a case-by-case basis considering all the facts and circumstances.'" *State v. Jackson*, 348 N.C. 52, 55, 497 S.E.2d 409, 411 (1998) (quoting *State v. Medlin*, 333 N.C. 280, 291, 426 S.E.2d 402, 407 (1993)). In *Jackson*, the evidence showed that

> at the request of two deputy sheriffs, the defendant accompanied them to the sheriff's office. While at the sheriff's office, the defendant consented to fingerprinting and gave blood and hair samples. He was under constant supervision. The defendant had told officers he was anxious to return to work, and despite answering all questions from them and telling them he had no knowledge of the crime, he was never told that he was free to leave or that he would be given a ride to his home or place of work if he decided to leave.

**STATE v. GREEN**

[129 N.C. App. 539 (1998)]

After being in the interrogation room for a period of approximately three hours, during which time he was questioned by the officers in regard to the murder, had hair and blood samples taken, and was fingerprinted, a reasonable man at the least would have wondered whether he was free to leave. When the sheriff asked him what he had done with the rifle he had used to kill the victim, this informed the defendant that the sheriff thought he had committed murder. A reasonable man in the defendant's position who had been interrogated for approximately three hours and thought the sheriff believed he had committed murder would not have thought he was free to leave. He would have thought the sheriff intended to hold him for prosecution for murder. Thus, we hold that the defendant was in custody when he inquired about an attorney.

*Id.* at 56, 497 S.E.2d at 411.

In the case before us, no reasonable man in defendant's position who had been interrogated for approximately seven hours and thought police officers from numerous agencies believed he had murdered, or was at the least an accessory to the murder of the father of one of the world's great athletes, would believe that he was free to leave. Defendant was in custody during his interrogation, was not advised of his *Miranda* rights, and his statements should have been excluded from evidence.

The majority attempts to distinguish *Jackson* from the case *sub judice* on grounds that the trial court in *Jackson* did not make findings of fact "as to whether Jackson was in custody." They argue that in the case at bar the trial court made "extensive findings of fact and concluded defendant was not in custody during the time in question." They hold that the "trial court's findings are supported by the record, and we are bound by them." While I agree that the trial court's findings of fact in this case are supported by competent evidence, "[t]he determination whether an individual is 'in custody' during an interrogation so as to invoke the requirements of *Miranda* requires an application of fixed rules of law and results in a conclusion of law and not a finding of fact." *State v. Davis*, 305 N.C. 400, 414-15, 290 S.E.2d 574, 583 (1982). In the instant case, the lengthy findings of fact made by the trial court simply do not support its conclusion of law that defendant was not in custody, and we are not bound by its conclusion.

Second, the majority points out that defendant in the present case never invoked his right to counsel, and that he did not make statements which were inculpatory on the charge of murder. The entire interrogative procedure was designed to lull defendant into failing to assert his rights to counsel, and thus bring the interrogation to an end. For example, defendant was not advised of his right to counsel, was assured that he was not "under arrest," and statements were made by the officers which implied that, if he were only involved in the murder of Mr. Jordan as an accessory, the punishment might not be as bad as he thought. While defendant never admitted that he murdered the victim, his statements certainly heavily involved him in the murder and robbery. Even assuming *arguendo* that defendant's statements did not directly implicate him in the murder, his illegally obtained statements were improperly used to impeach his alibi witnesses. In *James v. Illinois*, 493 U.S. 307, 107 L. Ed. 2d 676 (1990), the United States Supreme Court held that although illegally obtained evidence could be used to impeach the defendant's own testimony in a criminal case, such illegally obtained evidence may not be used to impeach other defense witnesses. The *James* court explained why it declined to expand the exception to the exclusionary rule.

> [M]uch if not most of the time, police officers confront opportunities to obtain evidence illegally after they have already legally obtained (or know that they have other means of legally obtaining) sufficient evidence to sustain a prima facie case. In these situations, a rule requiring exclusion of illegally obtained evidence from only the government's case in chief would leave officers with little to lose and much to gain by overstepping constitutional limits on evidence gathering. Narrowing the exclusionary rule in this matter, therefore, would significantly undermine the rule's ability "to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." Elkins v. United States, 364 U.S. 206, 217, 4 L Ed 2d 1669, 80 S Ct 1437 (1960). So long as we are committed to protecting the people from the disregard of their constitutional rights during the course of criminal investigations, inadmissibility of illegally obtained evidence must remain the rule, not the exception.

*James*, 493 U.S. at 319, 107 L. Ed. 2d at 687-88 (footnote omitted).

Finally, the majority attempts to distinguish *Jackson* by noting that defendant Jackson was searched and had his fingerprints, blood

and hair samples taken. In the present case, defendant Green consented to a search of the bedroom he occupied in his mother's home; was interrogated throughout the night by four officers, three of whom were armed; was told about evidence which tied him to a brutal murder; and was accused of having committed that murder. Despite slight factual differences, the facts in the present case are at least as compelling as those in *Jackson.* Thus, we are bound by the great constitutional principles *Jackson* reaffirms, and the result it reaches.

The trial court further concluded that "there was no inducement of hope that promised relief from a criminal charge." Yet the trial court found the following facts:

41. One or more of the officers stated to defendant that an "accessory to a crime is the lowest end to the crime, and the presumptive on accessory charge is about three years." The Court finds that this statement was made to impress upon defendant that he should be truthful about his role or involvement in the matter being investigated and that, if he had not actually committed the killing but had only participated after the fact, he should be truthful about his involvement. The defendant responded that he knew someone who had gotten "fifty years for Accessory (SIC)." Binder stated that that person might have gotten "fifty for Conspiracy, but not an Accessory."

\* \* \* \*

43. Captain Binder told defendant that he wanted to show him that he was not lying to him and showed him a "book" indicating that an accessory after the fact was punishable up to ten (10) years with a presumptive of three (3) years. Captain Binder then stated that a three year sentence today would be about "forty days." The Court finds that this statement was made in response to defendant's earlier accusation that the officers were not being truthful with him and in response to defendant's statement that, if he was an accessory, he believed that he faced a life sentence or fifty (50) years.

Following the statements of the officers about the likely punishment of a person implicated as an accessory *after* the fact to murder, with the possibility that imprisonment might only amount to "forty days," defendant gave several versions of his involvement with Larry Demery *after* the murder of James Jordan. "The ultimate test of

STATE v. GREEN

[129 N.C. App. 539 (1998)]

admissibility of a confession is whether the statement was in fact voluntarily and understandingly made." *State v. Davis*, 305 N.C. at 419, 290 S.E.2d at 586. Under the circumstances of this interrogation, the officers' statements amounted to an impermissible inducement of hope and defendant's statements should also have been excluded on the grounds that they were not freely or voluntarily made. While the opinion of the majority does not speak directly to the trial court's conclusion that defendant's statements were made "freely, voluntarily, and understandingly," it is obvious that the trial court struggled with its conclusion.

> The Court concludes that, while some of the comments or statements made by one or more of the officers, taken in isolation, *might be viewed as improper and might otherwise be suggestive of pressure or coercion,* in the context of the entire interrogation and under the totality of the circumstances, nothing about the comments or statements of the officers would render any statement or statements of the defendant involuntary.

(Emphasis added.)

Viewing the totality of circumstances surrounding the interrogation of defendant, the conclusion that defendant's statements were voluntarily made cannot survive appellate review. Considering those isolated statements which might be viewed as "improper and might otherwise be suggestive of pressure or coercion," together with the statements of the officers which gave defendant the hope of relatively short imprisonment, show that defendant's statements were not voluntary.

The United States Supreme Court stated that its purpose in *Miranda* was "to explore some facets of the problems . . . of applying the privilege against self-incrimination to in-custody interrogation, and to give concrete constitutional guidelines for law enforcement agencies and courts to follow." *Miranda*, 384 U.S. at 441-42, 16 L. Ed. 2d at 705. The Supreme Court began its discussion in *Miranda*, as it did in *Escobedo v. Illinois*, 378 U.S. 478, 12 L. Ed. 2d 977 (1964), with

> the premise that our holding is not an innovation in our jurisprudence, but is an application of principles long recognized and applied in other settings. We have undertaken a thorough reexamination of the Escobedo decision and the principles it announced, and we reaffirm it. That case was but an explication

of basic rights that are enshrined in our Constitution—that "No person . . . shall be compelled in any criminal case to be a witness against himself," and that "the accused shall . . . have the Assistance of Counsel"—rights which were put in jeopardy in that case through official overbearing. These precious rights were fixed in our Constitution only after centuries of persecution and struggle. And in the words of Chief Justice Marshall, they were secured "for ages to come, and . . . designed to approach immortality as nearly as human institutions can approach it." *Cohens v. Virginia*, 6 Wheat 264, 387, 5 L ed 257, 287 (1821).

*Miranda*, 384 U.S. at 442, 16 L. Ed. 2d at 705.

Because defendant's statements were not freely and voluntarily made, and because defendant's statements were improperly admitted into evidence in violation of basic rights "fixed in the Constitution," the privilege against self-incrimination, and the right to assistance of counsel, defendant is entitled to a new trial.