UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────

**No. 10-6652**

─────────

TERRENCE LOWELL HYMAN,

        Petitioner – Appellee,

    v.

ALVIN W. KELLER, JR.,

        Respondent – Appellant.

─────────

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. Terrence W. Boyle, District Judge. (5:08-hc-02066-BO)

─────────

Argued: May 13, 2011          Decided: July 21, 2011

Amended Opinion Filed: August 10, 2011

─────────

Before WILKINSON, KING, and AGEE, Circuit Judges.

─────────

Appeal stayed by unpublished per curiam opinion.

─────────

**ARGUED:** Mary Carla Hollis, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellant. Nicholas Collins Woomer-Deters, NORTH CAROLINA PRISONER LEGAL SERVICES, INC., Raleigh, North Carolina, for Appellee. **ON BRIEF:** Roy Cooper, Attorney General of North Carolina, Raleigh, North Carolina, for Appellant. Paul M. Green, Durham, North Carolina, for Appellee.

─────────

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

In September 2003, petitioner Terrence Hyman was convicted in the Superior Court of Bertie County, North Carolina, for the murder of Ernest Lee Bennett, Jr; he was then sentenced to life in prison without parole. Following unsuccessful direct appeals in the North Carolina courts, Hyman sought a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the Eastern District of North Carolina. The district court awarded habeas relief to Hyman, ruling that he had been denied his Sixth Amendment right to counsel, due to his trial lawyer's conflict as a potential exculpatory witness (the "exculpatory witness component" of Hyman's Sixth Amendment claim). See Hyman v. Beck, No. 5:08-hc-02066 (E.D.N.C. Mar. 31, 2010) (the "District Court Order").[1]

This appeal is pursued by respondent Alvin W. Keller, Jr., who serves as Secretary of North Carolina's Department of Correction (the "State"). The State asserts that the district court erred by ruling that the exculpatory witness component had been exhausted in the state courts and in awarding habeas relief on the merits thereof. As explained below, because the North Carolina courts have never explicitly resolved the exculpatory

---

[1] The District Court Order is found at J.A. 456-71. (Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.)

witness component, on either procedural or substantive grounds, the interests of federalism and comity compel us to stay this appeal pending further state court proceedings.

I.

A.

At his murder trial, Hyman was represented by lawyers Teresa Smallwood and W. Hackney High; this appeal implicates Smallwood's failure to withdraw from her representation of Hyman and testify on his behalf. Smallwood had interviewed a key witness against Hyman, Derrick Speller, in her investigation of Hyman's defense, and she had also briefly represented Speller in a probation violation hearing. Smallwood's interactions with Speller posed two separate conflicts underlying Hyman's Sixth Amendment claim — a "dual representation conflict," plus the "exculpatory witness conflict" before us on appeal. As the Court of Appeals of North Carolina concluded on direct review, the dual representation conflict emanated from Smallwood's representation of both Hyman and Speller. By contrast, the exculpatory witness conflict arose because Speller admitted to Smallwood, long before Hyman's trial, that he had seen a man named Demetrius Jordan shoot and kill Bennett.

In his first state court appeal ("Hyman I"), Hyman asserted his Sixth Amendment claim and discussed both conflict

4

of interest issues. Nevertheless, the Court of Appeals of North Carolina addressed only the dual representation conflict, remanding the matter for a hearing. On remand, the trial court concluded that Smallwood's representation of both Hyman and Speller had not adversely affected Hyman's defense. Hyman challenged that ruling before the state court of appeals ("Hyman II"), but the trial court's judgment was affirmed. Hyman thereafter petitioned for certiorari in the Supreme Court of North Carolina, seeking to have that court consider the exculpatory witness component of his Sixth Amendment claim. Certiorari was denied, however, on December 22, 2008. Accordingly, the North Carolina courts have never directly confronted the exculpatory witness conflict.

1.

The prosecution's theory at Hyman's September 2003 trial was that, on May 5, 2001, Bennett was shot and killed by Hyman in a bar fight at the L & Q Social Club, a nightclub in Bertie County. Speller testified at trial that he saw Hyman enter the club with a handgun and shoot Bennett, who was seeking to flee. Speller said that he then saw Hyman shoot Bennett again outside the club. Demetrius Jordan was also outside the club, according to Speller, but he only fired gunshots into the air.

5

When the prosecutor asked Speller whether he had discussed the case with anyone else, Speller acknowledged that he had spoken to "Teresa" — a reference to Teresa Smallwood, the lawyer then representing Hyman. See J.A. 62. On November 20, 2001, Smallwood interviewed Speller, who implicated Jordan and fully exculpated Hyman. A year later, in 2002, Smallwood briefly represented Speller in a probation violation hearing.

At Hyman's trial in 2003, the details of the November 2001 interview were prominently featured in Smallwood's cross-examination of Speller, as Smallwood sought to establish that Speller had previously identified Jordan as the killer, but had later altered his story because he was afraid of Jordan. For example, Smallwood asked Speller whether he had previously told her that Jordan (rather than Hyman) had actually shot Bennett. After Speller disclaimed any such conversation, Smallwood inquired whether Speller had admitted to her that Jordan would "off him [Speller] in a minute." J.A. 68. Speller also denied that statement.

Speller instead asserted at trial that, after his 2002 probation violation hearing, he talked with Smallwood about Hyman's case in the parking lot of her office. Speller's account was that he told Smallwood that his evidence "would harm [Hyman] more than [it] could help him." J.A. 72. Faced with Speller's intransigence, Smallwood requested the trial court to

6

allow her to confront Speller with the notes she made of the November 2001 interview. This was Smallwood's only request regarding her notes, and it was denied.

Other than Speller, the only witness implicating Hyman in Bennett's murder was Robert Wilson, another club patron. Smallwood and her co-counsel called two exculpatory eyewitnesses in their defense of Hyman. First, Demetrius Pugh testified that he saw Demetrius Jordan shoot Bennett three times, twice while Bennett was fleeing from the club and a third time after Bennett had exited. As Bennett lay on the ground outside the club, Jordan obtained another handgun and shot Bennett the third time. Pugh said that, although he saw Hyman at the club, he never saw Hyman with a firearm. Pugh further testified that when Bennett was shot, Hyman had already left the club.

Thereafter, Hyman's lawyers called Lloyd Pugh, the nightclub's owner (who was unrelated to Demetrius Pugh). Lloyd Pugh testified to breaking up a fight between Telly Swain — once a co-defendant of Hyman — and Swain's brother. While doing so, Lloyd Pugh saw Hyman leave the club. Although Lloyd Pugh later heard gunshots outside the club, Hyman was by then back inside.

On September 12, 2003, Hyman was found guilty by the jury of the offense of first-degree murder. On September 16, 2003, the jury recommended a sentence of life without parole,

7

which the court dutifully imposed.  Hyman's state court appeal proceedings then ensued.

## 2.

### a.

In the Hyman I appeal, Hyman sought relief from his conviction and sentence in the Court of Appeals of North Carolina.  He initially presented ten assignments of error, two of which (Assignments 9 and 10) are relevant to his Sixth Amendment claim.[2]  Assignment of Error 9 specified the following:

> The trial court erred in failing to conduct a voir dire when it became aware of a conflict of interest on the part of one of the Defendant's attorneys, who had previously represented Derrick Speller, one of the State's witnesses.

J.A. 248.  Assignment 10 stated:

> Defendant was denied the assistance of counsel because his attorney failed to withdraw from representation when it became apparent that she had a conflict of interest.

Id.

---

[2] Although the North Carolina Rules of Appellate Procedure have been amended so that a party is no longer required to set out assignments of error, see N.C. R. App. P. 10 (2010), the amended Rules did not become effective until 2009.  When Hyman's notice of appeal was filed in 2003, the applicable Rules, including Rule 10, required "[p]roposed issues that the appellant intends to present on appeal [to] be stated without argument at the conclusion of the record on appeal in a numbered list."  Assignments of Error 9 and 10 were on the Rule 10 list in Hyman I.

In his appellate brief in <u>Hyman I</u>, Hyman combined Assignments of Error 9 and 10 for briefing purposes. Addressing the dual representation conflict, Hyman explained that "[a]n actual conflict of interest exists where defense counsel represents both the defendant and a State's witness, even if that representation is in an unrelated matter." J.A. 268. Hyman maintained that the trial court had erred when, after being made aware of the dual representation conflict, it failed to conduct an appropriate hearing to render Hyman fully advised of the conflict and give him an opportunity to express his views.

Hyman's appellate brief in <u>Hyman I</u> further asserted, in an argument geared to the exculpatory witness conflict, that "[d]efense counsel Smallwood had a conflict of interest in that she was in possession of information which could be used to impeach Derrick Speller, one of the State's most crucial witnesses." J.A. 269. The brief explained this point further:

> Although [Smallwood] chose to remain as counsel and used the information she acquired in her representation of Speller to impeach his testimony, rather than withdrawing as counsel and testifying as a witness, it is not at all clear that this was the correct decision. It is certainly arguable that the information she had to impart would have carried more weight had she been on the stand testifying under oath.

<u>Id.</u>

9

Hyman's primary authority for his Sixth Amendment claim was State v. Green, 500 S.E.2d 452 (N.C. Ct. App. 1998), in which the Court of Appeals of North Carolina relied heavily on its earlier decision in State v. James, 433 S.E.2d 755 (N.C. Ct. App. 1993). In James, the defendant's attorney was simultaneously representing a prosecution witness on unrelated criminal charges. The James court recognized a Sixth Amendment conflict of interest issue and invoked the Supreme Court's precedent in Cuyler v. Sullivan, 446 U.S. 335 (1980). When a Sixth Amendment ineffective assistance claim is premised on an actual conflict of interest, Cuyler requires a showing that (1) petitioner's lawyer operated under a "conflict of interest" and (2) such conflict "adversely affected his lawyer's performance." 446 U.S. at 348. Applying Cuyler in James, the Court of Appeals of North Carolina recognized that the "representation of the defendant as well as a prosecution witness (albeit in another matter) creates several avenues of possible conflict for an attorney." 433 S.E.2d at 758. And, the court concluded that the James lawyer "did actively represent conflicting interests and this adversely affected defendant herein." Id. (explaining, inter alia, that "the overlap of representation prior to and at the time of trial of both parties by [the] attorney . . . resulted in an unavoidable conflict as to confidential communications, and affected counsel's ability to

10

effectively impeach the credibility of [the prosecution] witness . . . , thus compromising defendant's representation"). Finally, the court instructed that,

> in a situation of this sort, the practice should be that the trial judge inquire into an attorney's multiple representation once made aware of this fact. If the possibility of conflict is raised before the conclusion of trial, the trial court must take control of the situation. A hearing should be conducted to determine whether there exists such a conflict of interest that the defendant will be prevented from receiving advice and assistance sufficient to afford him the quality of representation guaranteed by the sixth amendment.

Id. (internal quotation marks omitted). The court deemed "the failure of the trial judge to conduct an inquiry" in James to be reversible error "in and of itself." Id. at 759.

Thereafter, in Green, the court of appeals assessed a situation where a defense lawyer "had to decide whether to pursue a line of impeachment questioning with a particular witness" and his choice "could have required the attorney himself to testify and thus could have created the possibility that the attorney would have to withdraw from the case." 500 S.E.2d at 460. The trial judge in Green readily recognized the lawyer's conflict and questioned the defendant to confirm that he understood the conflict and why his lawyer was abandoning a line of impeachment questioning. Proceeding carefully, the trial court appointed separate counsel to inform and advise the defendant on the conflict issue. Although the defendant

11

ultimately waived his right to conflict-free counsel, he later pursued a Sixth Amendment ineffective assistance claim on appeal. The court of appeals recognized that a defense lawyer who decides not to pursue a trial strategy that may require him to testify thereby jeopardizes his client's Sixth Amendment right to conflict-free counsel. Id. Nevertheless, the court concluded that the Green defendant had plainly waived the conflict during trial, and it thus declined to award any relief. Id.

b.

In its Hyman I decision of August 2, 2005, the Court of Appeals of North Carolina recognized that Smallwood had a conflict of interest that arose from her dual representation of both Hyman and Speller, and it remanded for the trial court to conduct an evidentiary hearing on whether Hyman's defense had been adversely affected thereby. See State v. Hyman, No. 04-1058 (N.C. Ct. App. Aug. 2, 2005) (the "Hyman I Opinion").[3] The court of appeals recited that, under Cuyler, a defendant who fails to timely object to a conflict of interest on the part of his lawyer must show that the conflict adversely affected the lawyer's trial performance. See 446 U.S. at 348. The court of

_____

[3] The Hyman I Opinion is found at J.A. 107-13.

12

appeals emphasized that, even absent an objection, when a trial court becomes aware of a lawyer's potential conflict of interest, it is obliged to conduct an appropriate hearing. See James, 433 S.E.2d at 758. Based on that precedent, the court of appeals observed that, "[l]ike the attorney in James, [Smallwood] had also previously represented a witness for the State on an unrelated charge." Hyman I Opinion 5. Thus, according to the court of appeals, the trial court erred by failing to comply with the hearing requirement of James. Nonetheless, the court of appeals was not convinced that Hyman was entitled to relief, explaining:

> Despite finding error in this case, we cannot find from the face of the record that defendant's attorney's prior representation of Speller affected her representation of defendant. As a result, we remand for an evidentiary hearing to determine if the actual conflict adversely affected the attorney's performance.

Id. at 5-6. In sum, the court of appeals concluded that Smallwood had a conflict of interest when she defended Hyman at trial, but only because she had represented Speller in the probation violation hearing. The court did not acknowledge the exculpatory witness conflict.

3.

On November 2, 2005, the trial court conducted the hearing directed by the court of appeals in Hyman I. At the

13

outset of the hearing, the prosecution set forth its view to the

trial court that the court of appeals had

> basically order[ed] that the trial judge make a
> finding or do an inquiry as to whether or not Ms.
> Smallwood, who is present and represented the
> defendant at trial, whether there was conflict of her
> prior representation of Derrick Speller, who was a
> State's witness in this case, whether there was a
> conflict and whether it adversely affected her
> representation of Mr. Hyman.

J.A. 117-18. The court accepted the prosecution's

characterization of the scope of the Hyman I remand hearing, and

thus addressed and disposed of the dual representation conflict

issue only.[4] The sole witness at the hearing was Smallwood

herself. She explained that her representation of Speller in

the probation violation hearing occurred on a single day in

2002, more than a year before the Hyman trial. According to

---

[4] Hyman appeared at the remand hearing with attorney Jackson Warmack, who had represented former co-defendant Telly Swain throughout the original murder proceedings. The court enlisted Warmack's assistance after it "discussed this matter with the prosecution" and "decided in the best interest of all that Mr. Hyman have a new attorney appointed to represent him." J.A. 115-16. Notwithstanding his prior involvement adverse to Hyman, Warmack agreed to the appointment, explaining that he "contacted the State bar and determined there would be no conflict there." Id. at 116. Warmack then represented to the court that he met with Hyman and "explained the situation and told him that if he had any problems with it this would be the time." Id. Following these representations, the court asked Hyman whether he had any objection to being represented by Warmack, and Hyman responded in the negative. See id.

14

Smallwood, she represented Speller for only five to ten minutes, during which there was no discussion of Hyman or the Bennett shooting. Smallwood also asserted (incorrectly) that her representation of Speller did not overlap with her representation of Hyman and that she was not even sure whether Hyman had been charged with Bennett's murder at the point she represented Speller. Smallwood maintained that she had discussions with Speller about Hyman's defense after her representation of Speller concluded. On cross-examination, Smallwood was asked whether she had any records regarding her representation of Speller. She replied that she did not, but that "[m]ore likely than not I was operating from my hip, which is what I have done for twenty years." J.A. 128.

After Smallwood's testimony, the trial court located its records regarding Smallwood's representation of Speller and Hyman. Those records revealed that Smallwood had appeared in Speller's probation violation hearing on September 26, 2002, and that Smallwood had actually been appointed to represent Hyman on the murder charge more than a year earlier, on May 14, 2001. At the conclusion of the remand hearing, the court ruled from the bench that

> [a]t this time I'm going to find and order that there was nothing about Ms. Smallwood's previous representation of Mr. Derrick Speller, a witness in this case, that adversely affected her performance or

15

her representation of Mr. Terrence Hyman in the trial of his case.

J.A. 133.

On November 28, 2005, the trial court issued an order consistent with its oral ruling. See State v. Hyman, 01-CRS-50423 (N.C. Sup. Ct. Nov. 28, 2005) (the "Remand Ruling").[5] The Remand Ruling addressed only the dual representation conflict and explained that

> [t]his matter comes . . . pursuant to an opinion of the North Carolina Court of Appeals . . . remanding the case to this Court to conduct an evidentiary hearing to determine if the actual conflict between the defendant's trial attorney Teresa Smallwood and a State's witness Derrick Speller adversely affected Ms. Smallwood's performance in the representation of the defendant Terrence Hyman.

Id. at 1. The Remand Ruling made several findings of fact, including the finding that, during her five- to ten-minute representation of Speller on September 26, 2002, Smallwood did not obtain any information about Speller that could have been used to impeach him. Id. at 2. The Remand Ruling denied relief on the dual representation conflict, specifying that "Smallwood's representation of Terrence Hyman was not adversely affected by her previous representation of Derrick Speller." Id.

---

[5] The Remand Ruling is found at J.A. 135-36.

16

After the Remand Ruling, Hyman again appealed to the Court of Appeals of North Carolina. In Hyman II, Hyman raised only three assignments of error, the third being that

> [t]he trial court's conclusion of law that defense counsel's representation of Defendant was not adversely affected by her prior representation of Derrick Speller is not supported by the trial court's findings of fact or by competent evidence in the record, and is erroneous as a matter of law.

J.A. 341. Hyman's brief responded to the trial court's findings of fact and asserted that the court had erred in ruling on the dual representation conflict. Hyman's brief argued that,

> [a]lthough Speller was cross-examined by Smallwood to some extent about these matters, it is apparent given the damaging nature of what she was told, that Ms. Smallwood's cross-examination would have been more vigorous, and certainly more illuminating.

Id. at 356-57. Hyman thus contended in Hyman II that the trial court erred in concluding that he was not adversely affected by Smallwood's prior representation of Speller.

On April 3, 2007, the court of appeals affirmed the Remand Ruling as to the dual representation conflict, and it accepted the trial court's conclusion that Smallwood's prior representation of Speller had not adversely affected Hyman. See State v. Hyman, No. 06-939 (N.C. Ct. App. Apr. 3, 2007) (the

17

"Hyman II Opinion").[6] The court of appeals characterized Hyman's contention thusly: "Defendant argues the trial court erred when it concluded Smallwood's representation of him had not been adversely affected by her prior representation of Speller, a State's witness." Id. at 3. The court of appeals again emphasized that "'[t]he right to effective assistance of counsel includes the right to representation that is free from conflicts of interest.'" Id. (quoting State v. Bruton, 474 S.E.2d 336, 343 (N.C. 1996)). Nonetheless, the court of appeals explained that, under State v. James, the trial court had correctly concluded that Smallwood's previous representation of Speller had not adversely affected Hyman: "As distinct from James, there was no overlap of representation prior to and at the time of trial between Smallwood's prior representation of Speller at his probation violation hearing and her representation of defendant at his first degree murder trial." Id. at 5 (internal quotation marks omitted).[7] Furthermore, the court of appeals observed:

_____

[6] The Hyman II Opinion is found at J.A. 137–41.

[7] As established at the remand hearing, Smallwood represented Speller at his probation violation hearing on September 26, 2002. She had by then already been representing Hyman since May 2001. Hyman's trial did not commence until September 2003.

18

> No evidence was shown that Smallwood's prior representation of Speller affected her ability to effectively impeach the credibility of witness Speller. The record on appeal contains no evidence that Smallwood obtained any information about either Speller or defendant during her representation of defendant that Smallwood could have used to impeach Speller during trial.

Id. (internal quotation marks omitted). Again, as in Hyman I, the court did not acknowledge the exculpatory witness conflict.

5.

Thereafter, on May 31, 2008, Hyman petitioned for certiorari in the Supreme Court of North Carolina. In his petition, Hyman presented only one contention, specifying that his

> Sixth Amendment right to the effective assistance of conflict-free counsel was violated by defense attorney Smallwood's position as a witness to a highly material prior inconsistent statement by a key state's witness (her former client), directly contradicting his trial testimony and exonerating petitioner of this crime.

J.A. 201. Thus, Hyman refined his Sixth Amendment claim to encompass only the exculpatory witness component, and he underscored that the court of appeals "didn't mention Smallwood's conflicted position as a witness to Speller's highly material inconsistent prior statement." Id. at 200. According to Hyman, his Sixth Amendment right to counsel had been abridged in that "it is part of clearly established federal law that a Sixth Amendment violation may arise not only from conflicts

19

between the interests of counsel's clients, but also from conflicts between the client's and counsel's own interests." Id. at 202. Hyman maintained that Smallwood's conflict adversely affected him in that "it would be impossible for any attorney to make an objective assessment of her own importance as a witness, independent of personal and professional considerations arising from her likely inability to continue serving as counsel." Id. at 208. On December 11, 2008, the Supreme Court of North Carolina summarily denied Hyman's petition for certiorari. See State v. Hyman, No. 245P08 (N.C. Dec. 11, 2008).

B.

On May 8, 2008, Hyman turned to the federal courts, petitioning for habeas corpus relief in the Eastern District of North Carolina, pursuant to 28 U.S.C. § 2254.[8] In his § 2254 petition, Hyman contended that

---

[8] Hyman filed his § 2254 petition in the district court prior to seeking certiorari in the Supreme Court of North Carolina. As a result, on October 15, 2008, the district court stayed Hyman's § 2254 petition pending a ruling on the petition for certiorari. On January 19, 2009, after the state supreme court denied the certiorari petition, the district court lifted its stay. Notably, Hyman has never sought state collateral review of his conviction and sentence. See N.C. Gen Stat. § 15A-1414 (specifying that defendant may pursue motion for appropriate relief ("MAR") — North Carolina's statutory procedure for collateral review — within ten days of entry of (Continued)

20

the state court unreasonably failed to recognize that Smallwood's conflict arose not merely from having previously served as Speller's attorney, but from Smallwood's position as the only person able to testify that Speller made a highly inconsistent prior statement identifying the shooter as Demetrius Jordan, not Hyman.

J.A. 23. By its Order of March 31, 2010, the district court granted the writ. The District Court Order addressed and disposed of two issues: (1) whether the exculpatory witness component of Hyman's Sixth Amendment claim had been exhausted in the North Carolina courts; and (2) whether Hyman was entitled to relief under the Sixth Amendment.

Appropriately, the district court began with the exhaustion issue. In its motion for summary judgment, the State maintained that Hyman had failed to exhaust the exculpatory witness component, in that he did not fairly present it to the Court of Appeals of North Carolina. The State pointed out that Hyman did not proffer any evidence or examine Smallwood at the remand hearing regarding the possibility that she could have withdrawn and testified, nor did he argue the issue in his <u>Hyman</u>

criminal judgment). <u>But see</u> <u>id.</u> § 15A-1415(b)(3) (providing that defendant may file MAR more than ten days after entry of judgment if "[t]he conviction was obtained in violation of the Constitution of the United States"); <u>State v. Goodson</u>, 600 S.E.2d 519, No. COA03-834, 2004 WL 1920948, at *4 (N.C. Ct. App. July 6, 2004) (unpublished table decision) ("[An MAR] based on [Sixth Amendment] grounds may be filed any time after the verdict is announced.").

21

II brief. Moreover, according to the State, if Hyman were to return to the state courts and attempt to raise the exculpatory witness component anew, he would be procedurally barred from doing so. As such, the State contended, Hyman had procedurally defaulted the exculpatory witness component for purposes of federal court review. The district court disagreed with the State, premised on its determination that there was no failure to exhaust because both the Court of Appeals and the Supreme Court of North Carolina "were given a 'full and fair opportunity' to consider the substance of [Hyman's] claim." District Court Order 10 (quoting Larry v. Branker, 552 F.3d 356, 366 n.10 (4th Cir. 2009)).

Turning next to the merits of Hyman's Sixth Amendment argument, the district court, guided by Cuyler, reasoned that "[o]nce a petitioner shows an actual conflict adversely affected his representation by counsel, prejudice is presumed, and he is entitled to relief." District Court Order 12. Furthermore, "if during pretrial representation counsel becomes a witness to events at issue in the client's case, there is a conflict with great potential for adverse effect." Id. at 14 (citing Rubin v. Gee, 292 F.3d 396, 401-02 (4th Cir. 2002)). Here, the court observed, Smallwood "chose to continue as counsel" rather than "testify herself and proffer impeaching testimony," even though her evidence would have corroborated the testimony of Demetrius

22

Pugh that Jordan had actually murdered Bennett. Id. at 15.[9] "Smallwood's actual conflict of interest [thereby] adversely affected her performance," and Hyman was denied his Sixth Amendment right to counsel. Id. The implicit conclusion of the North Carolina courts to the contrary was, according to the district court, "an objectively unreasonable application of clearly established federal law to the facts of [Hyman's] case." Id. at 16. The court therefore granted Hyman a writ of habeas corpus.

The State has timely appealed from the district court's judgment granting the writ, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.


II.

We review de novo a district court's decision to award habeas corpus relief. See Bauberger v. Haynes, 632 F.3d 100, 103 (4th Cir. 2011). Our analysis is tempered by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). In accordance with AEDPA, a federal court may grant habeas

---

[9] The district court recognized that Smallwood's testimony would have been admissible at trial to impeach Speller and prove his prior inconsistent statement identifying Jordan as Bennett's murderer, since the identity of the killer was the controlling material issue. See Order 13-14 (citing State v. Green, 250 S.E.2d 197, 203 (N.C. 1978)); see also State v. Batchelor, 660 S.E.2d 158, 161 (N.C. Ct. App. 2008).

corpus relief only insofar as (1) the state court adjudication of the issue on its merits "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

III.

In this appeal, the State not only continues to contest the merits of the exculpatory witness component of Hyman's Sixth Amendment claim, but also reiterates the contention that Hyman failed to exhaust the exculpatory witness component of the claim in the North Carolina courts and procedurally defaulted federal review.  Section 2254(b)(1)(A) of Title 28 provides that a writ of habeas corpus shall not be granted unless "the applicant has exhausted the remedies available in the courts of the State."  Furthermore, "[a]n applicant shall not be deemed to have exhausted the remedies available in the courts of the State . . . if he has the right under the law of the State to raise, by any available procedure, the question presented."  28 U.S.C. § 2254(c);  see O'Sullivan v. Boerckel, 526 U.S. 838, 844 (1999) ("Section 2254(c) requires

24

only that state prisoners give state courts a _fair_ opportunity to act on their claim.").

As we explained in _Breard v. Pruett_, "[a] distinct but related limit on the scope of federal habeas review is the doctrine of procedural default." 134 F.3d 615, 619 (4th Cir. 1998). One manner in which procedural default occurs is

> when a habeas petitioner fails to exhaust available state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.

_Id._ (internal quotation marks omitted). Procedural default also occurs "[i]f a state court clearly and expressly bases its dismissal of a habeas petitioner's claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal." _Id._

Notably, the Supreme Court of the United States has recently instructed that,

> [w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.

_Harrington v. Richter_, 131 S. Ct 770, 784 (2011). The Court added, however, that "[t]he presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." _Id._ (citing _Ylst v. Nunnemaker_, 501 U.S. 797, 803 (1991)).

25

Here, the State contends that Hyman did not fairly raise the exculpatory witness component in the North Carolina courts and thereby "failed to exhaust his federal claim." Br. of Appellant 11. The State further maintains that, "[b]ecause Hyman cannot now return to state court and raise his § 2254 claim anew, it is procedurally defaulted." Id. Of course, as heretofore discussed, neither the Court of Appeals nor the Supreme Court of North Carolina has directly confronted the procedural or substantive propriety of the exculpatory witness component. Instead, the court of appeals decisions in Hyman I and Hyman II each focused on the dual representation conflict issue, and the state supreme court summarily denied Hyman's petition for certiorari.

Unfortunately, the basis for the North Carolina courts' lack of attention to the exculpatory witness conflict is unclear — perhaps they did not consider that component of Hyman's Sixth Amendment claim to be fairly presented, perhaps they meant to implicitly reject it on the merits, or perhaps they simply overlooked it. Thus, we are uncertain whether, if Hyman seeks to resurrect the exculpatory witness component in the state courts, those courts will enforce a procedural bar.

In these unusual circumstances, we are constrained to employ the "stay and abeyance procedure" approved by the Supreme Court in connection with unexhausted § 2254 claims. See Rhines

26

v. Weber, 544 U.S. 269, 275-78 (2005). The Rhines Court assessed how the lower federal courts should deal with "mixed" habeas petitions (where certain constitutional claims have been exhausted but others have not) in a post-AEDPA setting. See 544 U.S. at 269. Prior to AEDPA's enactment, a district court could dismiss a mixed habeas petition without prejudice and permit the petitioner to return to state court on the unexhausted claims. AEDPA, however, imposed a time constraint that required a § 2254 petitioner to seek federal habeas corpus relief within a year of a final adjudication in the state courts. As such, the dismissal of a mixed petition without prejudice is no longer a feasible option for a federal court, in that the § 2254 petition could ultimately be adjudged time-barred under AEDPA.

In recognizing an alternative to dismissal, the Rhines Court stressed the federalism and comity-related importance of permitting the state courts to assess constitutional claims in the first instance — before a federal court does so:

> "Because it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation, federal courts apply the doctrine of comity."

544 U.S. at 274 (quoting Rose v. Lundy, 455 U.S. 509, 518 (1982); see also Elmore v. Ozmint, No. 07-14 (4th Cir. Mar. 24, 2008) (unpublished order staying appeal involving mixed § 2254 petition "in the interests of federalism and comity").

27

Additionally, as the Rhines Court explained, the doctrine of comity counsels that a federal court

> should defer action on causes properly within its jurisdiction until the courts of another sovereignty with concurrent powers, and already cognizant of the litigation, have had an opportunity to pass on the matter.

544 U.S. at 274. With comity specifically in mind, the Court concluded that, in the proper circumstances, a § 2254 petition should be stayed for a reasonable time to enable the petitioner to return to state court and pursue his arguably unexhausted claim. Id. at 277-78. The Court has subsequently extended the Rhines rationale beyond mixed § 2254 petitions. See Pace v. DiGuglielmo, 544 U.S. 408, 416 (2005); see also Heleva v. Brooks, 581 F.3d 187, 191-92 (3d Cir. 2009).

In its Pace decision, the Supreme Court pondered whether the filing of an untimely application for State post-conviction or collateral review tolls the AEDPA time bar established in 28 U.S.C. § 2244(d)(2).[10] The Court ruled in the negative, but went on to explain that

> [a] prisoner seeking state post-conviction relief might avoid this predicament . . . by filing a 'protective' petition in federal court and asking the

---

[10] Section 2244(d)(2) of Title 28 provides that "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."

28

federal court to stay and abey the federal habeas proceedings until state remedies are exhausted.

Id. at 416. The stay and abeyance procedure was recommended by the Pace Court without any discussion of whether the habeas petitioner was pursuing a mixed § 2254 petition. To the contrary, the Pace decision appears to authorize use of the stay and abeyance procedure under any circumstances that could warrant a state court resolution of a prisoner's claims.

Before we review the district court's award of § 2254 relief on the exculpatory witness component of Hyman's Sixth Amendment claim, the doctrines of federalism and comity constrain us to provide the North Carolina courts with an opportunity to weigh in on the procedural and substantive issues. We are therefore content to stay this appeal pending any appropriate state court proceedings.[11]

IV.

Pursuant to the foregoing, we hereby stay this appeal pending such other and further state court proceedings as may be appropriate, or pending further order of this Court. During the

---

[11] We take no position as to what, if any, procedural avenues may yet be available to Hyman in the Court of Appeals or Supreme Court of North Carolina. We observe, however, that Hyman could have recourse by way of North Carolina's statutory MAR process. See supra note 8; N.C. Gen Stat. § 15A-1411 et seq.

29

pendency of the stay, we request that counsel — at least every ninety days — provide us with appropriate status reports.

APPEAL STAYED