ELMORE, Judge.
*47 On 16 September 2003, Terrence Lowell Hyman (defendant) was convicted of first-degree murder and sentenced to life in prison without parole. After a series of post-trial motions and appeals in state and federal *310 court, defendant filed a motion for appropriate relief in Bertie County Superior Court claiming, inter alia , that he was denied his right to effective assistance of counsel based upon his trial counsel's failure to withdraw and testify as a necessary witness. The trial court denied defendant's motion.
We allowed defendant's petition for writ of certiorari to review the trial court's order denying his motion for appropriate relief. Upon review, we hold the trial court erred in concluding that (1) defendant's exculpatory witness claim was procedurally barred under N.C. Gen. Stat. § 15A-1419(a) ; (2) defendant's exculpatory witness claim had no evidentiary support; and (3) defendant could demonstrate neither deficient performance nor prejudice which would entitle him to relief under Strickland v. Washington , 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Reversed.
I. Background
On 30 July 2001, a Bertie County grand jury indicted defendant for the murder of Ernest Lee Bennett Jr., who was shot and killed during a brawl at a crowded nightclub. The trial court appointed Teresa Smallwood and W. Hackney High to represent defendant. He was tried *48 capitally at the 25 August 2003 Special Criminal Session in Bertie County Superior Court, the Honorable Cy A. Grant presiding.
At trial, the State offered testimony from two eyewitnesses, Robert Wilson and Derrick Speller, who both testified that defendant shot Bennett. Wilson testified that he saw defendant enter the nightclub with a .380 caliber handgun. A few seconds later, Wilson heard two gunshots inside and saw Bennett run out of the door. A man following Bennett hit him in the head with a bottle, knocking him out. As Bennett lay on the ground, Wilson saw defendant exit the nightclub and shoot Bennett four times.
Speller testified that defendant walked into the nightclub with a handgun and shot Bennett during the fight. Bennett ran toward the door, clenching his side as defendant continued to shoot. Speller followed out the main entrance where he saw Bennett lying on the ground. He watched defendant kneel over Bennett and shoot him again. As Speller ran toward his car, he heard more gunshots behind him. He turned and saw another man, Demetrius Jordan, shooting a nine-millimeter handgun into the air.
The State's medical examiner, Dr. Gilliland, testified that Bennett had four gunshot wounds and blunt force injuries to his scalp. Bennett was shot in the back of his head, the right side of his back, the left side of his back, and his left buttock. According to Dr. Gilliland, either of the two wounds to Bennett's back would have been fatal. A .380 caliber bullet was recovered from the wound to the right side of Bennett's back. Law enforcement found two .380 caliber casings inside the nightclub. More .380 caliber casings and bullets were recovered outside along with six nine-millimeter casings.
At the close of the State's evidence, defendant offered testimony from two witnesses, Lloyd Pugh (L. Pugh) and Demetrius Pugh (D. Pugh), who testified that defendant was not the shooter. L. Pugh, the owner of the nightclub, testified that he heard two gunshots ring out as he was trying to break up the fight. When the shots were fired, he was "looking at [defendant] telling him you all get out of here." Defendant did not have a gun. L. Pugh saw defendant and Bennett leave and heard more gunshots coming from outside. At that point or shortly thereafter, L. Pugh ran into defendant at the door as defendant was coming back inside to tend to his cousin, who had been knocked out during the fight. Defendant was still unarmed.
D. Pugh testified that he saw Demetrius Jordan shoot Bennett inside the nightclub with a .380 caliber handgun. Jordan shot Bennett again *49 as Bennett broke for the door and two more times outside. Jordan then retrieved a nine-millimeter handgun from his car and shot Bennett one last time before firing the remaining rounds into the air. D. Pugh never saw defendant with a gun. He testified that defendant had already left through the back door when Jordan first shot Bennett inside the nightclub.
Derrick Speller's Cross-Examination
When the State called Speller to testify at trial, Smallwood informed High for the first time that she had interviewed Speller. She *311 previously represented Speller in an unrelated probation matter and, around that time, had spoken to him about defendant's case. During recess after Speller's direct examination, Smallwood retrieved a set of handwritten notes dictating their conversation:
11/20/01 Derrick Speller
Saw the whole thing
Demet had a .380 and a 9 mm.
He shot the guy and then ran out the back door
Somebody else shot at the guy with a chrome looking small gun but "I don't know who it was."
"I heard Demetrius shot him again outside but I don't know for sure."
"I think it was a 9 mm he (Demet) had outside.["]
Never gave a statement to police because he hustled for
Demet and Turnell and them niggers are lethal.
Can you shoot me a couple of dollars.
Smallwood attempted to cross-examine Speller about their conversation to show that Speller had previously identified Demetrius Jordan as the shooter. Speller conceded that he spoke with Smallwood about the case before trial but denied making any of the statements reflected in her notes. He testified: "I told you at that time that I couldn't help you on this case, that I would harm [defendant] more than I could help him if I was brought on the stand to testify. That's the only conversation that you and I ever had about this case." The trial court did not allow Smallwood to show Speller her notes from the conversation or to admit the notes into evidence at trial.
First Appeal: Hyman I
After his conviction, defendant filed his first appeal with the North Carolina Court of Appeals.
*50 State v. Hyman (Hyman I) , No. COA04-1058, 2005 WL 1804345 (N.C. Ct. App. Aug. 2, 2005). As characterized by the Court, defendant argued that the trial court failed to conduct a hearing when it became aware of a potential conflict of interest on the part of Smallwood, who had previously represented Speller in an unrelated case. Id. at *4. The Court determined:
Although the trial court was made aware of this representation, the trial court failed to conduct an inquiry and " 'determine whether there exist[ed] such a conflict of interest that ... defendant [would have been] prevented from receiving advice and assistance sufficient to afford him the quality of representation guaranteed by the [S]ixth [A]mendment.' "
Id. at *5 (citing State v. James , 111 N.C.App. 785, 791, 433 S.E.2d 755, 758 (1993) ). Because the Court could not "find from the face of the record that defendant's attorney's prior representation of Speller affected her representation of defendant," however, it remanded "for an evidentiary hearing to determine if the actual conflict adversely affected [Smallwood's] performance." Id. at *6 (citation and internal quotation marks omitted).
Evidentiary Hearing on Remand
The evidentiary hearing was held on 3 October and 2 November 2005 before Judge Grant. Defendant and his trial counsel, Smallwood and High, were all present. The trial court had determined it was in defendant's best interest to have new counsel for the hearing and appointed Jack Warmack to represent him.
Warmack had previously represented Telly Swain, a co-defendant charged with Bennett's murder. The State eventually dropped the first-degree murder charge as part of a plea agreement in which Swain pleaded guilty on two lesser offenses and agreed "to testify truthfully against any co-defendant upon request by the State." On Warmack's advice, Swain also gave a written statement to police implicating defendant in the murder but Swain did not testify at trial.
Warmack expressed concern over the potential conflict of interest arising from his prior involvement in the case. He informed defendant that he had represented Swain and contacted the State Bar. Warmack ultimately determined he had no conflict of interest because he viewed his role at the remand hearing as a limited one: "I didn't think my purpose was to establish that there were-there was no conflict, but to get what *312 [Smallwood] had to say about it on the record so the Court of Appeals could determine whether in their opinion there was a conflict or *51 not." If his appointment had required him to conduct his own investigation to prove that Smallwood had an actual conflict of interest, Warmack explained, then he himself would have been "conflicted out."
At the evidentiary hearing, Smallwood testified about her interaction with Speller leading up to defendant's trial. Speller had retained Smallwood's law partner, Tonza Ruffin, to represent him on a probation violation matter and at some point Smallwood stepped in for Ruffin to enter a plea on defendant's behalf. Smallwood testified that the scope of her representation in the matter lasted "maybe five or ten minutes." During that time, Smallwood did not speak to Speller about defendant's case. She insisted "there was nothing as a result of my representation of [Speller] that I would have obtained regarding [defendant]." Smallwood explained that the conversation with Speller which she alluded to at trial "took place from an investigatory standpoint" after her representation of Speller and incident to her preparation for defendant's trial.
During a recess of the hearing, Judge Grant spoke with the deputy clerk of court about the dates of Speller's probation violation matter. The records indicated that Speller was served with an order of arrest on 18 July 2002 and he appeared in court for a hearing on 26 September 2002. Ruffin was listed as the attorney of record but Smallwood had represented Speller at the hearing. Smallwood was appointed to represent defendant on 14 May 2001.
The trial court entered an order on 28 November 2005 following the evidentiary hearing. In its order, the trial court found:
12. That Ms. Smallwood never spoke with Derrick Speller about his case prior to September 26, 2002 and only spoke with him five or ten minutes prior to the violation hearing.
13. That Attorney Smallwood during her five to ten-minute conversation with Derrick Speller never spoke with Derrick Speller concerning any matter relating to her representation of Terrence Hyman.
14. During her five to ten-minute conversation with Derrick Speller Attorney Smallwood did not obtain any information for or about Derrick Speller that she could have used to impeach or attack Derrick Speller's credibility as a witness during the trial of the defendant Terrence Hyman.
The court ultimately concluded that Smallwood's representation of defendant was not adversely affected by her previous representation of Speller.
*52 Second Appeal: Hyman II
Defendant appealed the order to the North Carolina Court of Appeals, arguing that the trial court erred in concluding Smallwood's prior representation of Speller did not adversely affect her representation of defendant. State v. Hyman (Hyman II) , No. COA06-939, 2007 WL 968753, at *3 (N.C. Ct. App. Apr. 3, 2007). The Court affirmed the order because the uncontested findings showed, inter alia , that there was no overlap of representation, and that during her representation of Speller, Smallwood did not obtain any information about defendant from Speller that she could have used to impeach him at trial. Id. at *4-5. The North Carolina Supreme Court denied defendant's petition for writ of certiorari. State v. Hyman , 362 N.C. 685, 671 S.E.2d 325 (2008).
Writ of Habeas Corpus in U.S. District Court
Defendant filed a petition for writ of habeas corpus in the U.S. District Court for the Eastern District of North Carolina pursuant to 28 U.S.C. § 2254. See Hyman v. Beck , No. 5:08-hc-02066-BO (E.D.N.C. Mar. 31, 2010). Defendant maintained that his Sixth Amendment right to effective assistance of conflict-free counsel was violated. The state court's decision to the contrary, he argued, was an objectively unreasonable application of clearly established federal law to the facts of his case.
Granting defendant's petition, the court first concluded that defendant had exhausted "his state remedies for purposes of § 2254 because the North Carolina Court of Appeals [and] the North Carolina Supreme Court were given a 'full and fair opportunity' to *313 consider the substance of his claim." The court focused its substantive discussion on whether Smallwood had a conflict of interest in that she could have served as a material witness at defendant's trial and, in her role as counsel, her questions on cross-examination could not be considered evidence. The attorney-client privilege, the court noted, was not at issue because the lower court found that Smallwood did not obtain any information from Speller about defendant during her representation of Speller.
Guided by Cuyler v. Sullivan , 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), the court concluded that defendant was entitled to relief and vacated his conviction. The court explained that Smallwood "became a material witness with a conflict of interest" when Speller "testified in direct contravention to a conversation she had with him and for which she had taken contemporaneous notes." Smallwood ignored that her testimony "may have changed the outcome of trial" and chose instead "to continue as counsel in light of the need to testify herself and proffer impeaching testimony."
*53 Because "Smallwood's actual conflict of interest adversely affected her performance," defendant was denied his Sixth Amendment right to effective assistance of conflict-free counsel and any contrary conclusion by the state courts "was an objectively unreasonable application of clearly established federal law to the facts of his case."
Appeal to the U.S. Court of Appeals for the Fourth Circuit
The State appealed the district court's order granting the writ of habeas corpus, contesting both the substance and procedural posture of defendant's Sixth Amendment claim in federal court. Hyman v. Keller , No. 10-6652, 2011 WL 3489092, at *8 (4th Cir. Aug. 10, 2011). The State argued that defendant "procedurally defaulted federal review" because he "did not fairly raise the exculpatory witness component in the North Carolina courts." Id. at *8-9. The Fourth Circuit agreed that defendant had failed to exhaust his federal claim:
[N]either the Court of Appeals nor the Supreme Court of North Carolina has directly confronted the procedural or substantive propriety of the exculpatory witness component. Instead, the court of appeals decisions in Hyman I and Hyman II each focused on the dual representation conflict issue, and the state supreme court summarily denied Hyman's petition for certiorari.
Unfortunately, the basis for the North Carolina courts' lack of attention to the exculpatory witness conflict is unclear-perhaps they did not consider that component of Hyman's Sixth Amendment claim to be fairly presented, perhaps they meant to implicitly reject it on the merits, or perhaps they simply overlooked it.
Id. at *9-10. In reaching its disposition, the Fourth Circuit explained that dismissing without prejudice "mixed" habeas petitions, i.e., those involving both exhausted and unexhausted constitutional claims, "is no longer a feasible option for a federal court, in that the § 2254 petition could ultimately be adjudged time-barred under [the Antiterrorism and Effective Death Penalty Act of 1996]." Id. at *10. The court decided, based on the unusual circumstances of the case, "to employ the 'stay and abeyance procedure' approved by the Supreme Court in connection with unexhausted § 2254 claims." Id. (citing Rhines v. Weber , 544 U.S. 269, 275-78, 125 S.Ct. 1528, 161 L.Ed.2d 440 (2005) ). Accordingly, the court stayed the appeal "to provide the North Carolina courts with an opportunity to weigh in on the procedural and substantive issues." Id. at *11.
*54 Motion for Appropriate Relief
After the Fourth Circuit's decision, defendant filed a motion for appropriate relief (MAR) in Bertie County Superior Court. In defendant's first and principal claim, characterized by the trial court as "Claim 1," he argued that his "Sixth Amendment right to effective, conflict-free counsel was violated because one of his trial attorneys was also a crucial defense witness who did not testify due [to] her conflict as his attorney." He separated his claim further into three components, maintaining that each independently entitled him to relief: (a) "Smallwood had a conflict between her duties to her former client, the State's witness, and her duties to *314 [defendant] ('the prior representation component')"; (b) "Smallwood had a conflict in that she was a critical witness for [defendant] but could not testify because she was his attorney ('the witness component')"; and (c) "there was a conflict between [defendant's] interest in having Smallwood withdraw and present impeachment evidence against a key State's witness and Smallwood's own financial interest in remaining on [defendant's] case ('the financial component')."
An evidentiary hearing for defendant's MAR was held on 3 June 2014 before Judge Grant in Hertford County Superior Court.[1] Defendant was present, represented by attorneys Mary Pollard and Nicholas C. Woomer-Deters, and offered testimony from W. Hackney High, defendant's trial counsel; Tonza Ruffin, Smallwood's law partner; Andrew Warmack, defendant's counsel from the evidentiary hearing; and Ravi Manne, an attorney with North Carolina Prisoner Legal Services. Despite his efforts, defendant was unable to produce Smallwood as a witness. Smallwood was disbarred almost three and a half years after defendant's trial for separate misconduct and had since left the state.
Ruffin's testimony tended to authenticate Smallwood's notes and confirm Smallwood's purported conversation with Speller. Prior to defendant's trial, Ruffin was "under the impression that [Derrick] Speller had information that would be helpful to the case." She was familiar with Smallwood's handwriting and identified the notes dated 20 November 2001 with Speller's name at the top as those written by Smallwood. She did not remember being present when the notes were written but she was present when Speller and Smallwood met in the parking lot of her law office:
*55 A. I remember him coming having [sic] a conversation. I remember believing that he was going to be helpful to Ms. Smallwood. But I don't remember the exact conversation.
THE COURT: Do you remember anything Teresa may have said to you after he left about what he may have said?
A. Yes.
THE COURT: Go ahead.
A. I remember him-I mean, I remember Teresa saying that he claimed that he saw everything. I remember him-I don't remember her seeking him out. I remember him seeking her out saying that basically I can help you; I was there that night; I saw everything that went down.
BY MS. ASBELL:
Q. And that's your memory of what Ms. Smallwood told you?
A. That's my memory of what Ms. Smallwood told me and that's my memory of his attitude when he was in the parking lot that day. But I can't tell you verbatim what he said in the parking lot. But he definitely wanted to be helpful in the case.
Ruffin later testified that Speller "came over on other occasions" but she did not participate in those meetings.
During Ruffin's cross-examination, the State presented a copy of Smallwood's time sheet, which showed no entry for 20 November 2001 and no entry for an interview of Derrick Speller. (There was a 30 November 2001 entry for "file review, witness interview.") Ruffin confirmed that attorneys submit their time sheets with Indigent Defense Services (IDS) to be paid and agreed that Smallwood's entries were otherwise "very specific." But when asked if she would list "every single thing that you do" for a client, Ruffin replied, "We try to but a lot of times we don't." Later at the hearing, Manne offered his own opinion about the time sheets: "I don't know that I would view the time sheets as controlling. I know for my time keeping [ ] I don't put everything on the exact date at the same time."
High testified about his professional relationship with Smallwood and how the events involving Speller unfolded at trial. High and Smallwood had some problems when they first began working on *56 defendant's case. There was even an occasion when Smallwood attempted to have High removed as co-counsel but they "were able to put that aside" and work together "fairly well" from that point *315 forward. Prior to trial, High had some indication that Speller would testify against defendant. Because Speller never provided a written statement to police, however, High did not know "specifically what [Speller] was going to say."
High and Smallwood initially agreed that High would cross-examine Speller if the State called him as a witness. High explained that they had divided the witness list in a way "that would even out the work" but if Smallwood "had a particular knowledge of a witness or what their style was she might say well it's better for me to handle this one, why don't you get the next one." That plan changed in a "spur of the moment decision" when Smallwood revealed to High that she had previously spoken to Speller. High testified:
We do our best to anticipate the witness order that the state will call the witnesses in. But you never know for sure and so it's always a crapshoot until you actually hear the District Attorney say the next witness who will be called will be so and so.
So when [Derrick] Speller's name was called as the next witness in that manner, Ms. Smallwood kind of leaned over to me and said don't worry about this one, I've got it.
High recalled Smallwood leaving court during recess and returning from her office with several documents. She told High that she had notes from a prior conversation with Speller, and she would use her notes to impeach Speller on cross-examination.
The trial court also heard arguments at the hearing on the admissibility of Smallwood's testimony had it been offered at trial. The State argued that Smallwood's testimony would not have been admissible because once Speller denied the conversation, Smallwood was "stuck" with his answer and could not introduce extrinsic evidence as to what Speller allegedly told her. And even if she had withdrawn to take the stand, the extent of her permissible testimony would have been: "[Derrick] Speller told me something different than what he testified to." Defendant, in response, argued that Smallwood's testimony would have been admissible because it went to a material fact in issue, i.e., the identity of the shooter.
After the hearing, the trial court notified the parties in writing that it would enter an order denying defendant's MAR. As the sole basis for *57 its denial, the court concluded that "Smallwood could not have testified about Derrick Speller's prior inconsistent statement to her, and introduced her notes or the conversation where he made that statement, after Derrick Speller denied making the statement on cross-examination." The court thereafter adopted a forty-five-page order, prepared by the State, denying all claims within defendant's MAR.
Notably, the trial court made the following findings in its order regarding the alleged conversation between Smallwood and Speller:
32. Defendant presented no credible evidence that the conversation which Ms. Smallwood claimed she had with Speller ever took place.
33. Defendant presented no credible evidence that Defendant's MAR Exhibit 1 contained, as he purported, notes taken contemporaneously with any conversation between Ms. Smallwood and Speller.
34. Defendant presented no credible evidence that the purported conversation between Ms. Smallwood and Speller took place on the date appearing on Defendant's MAR Exhibit 1, i.e., November 20, 2001.
35. Given the evidence presented at the MAR evidentiary hearing, the Court cannot definitely find based only upon Defendant's MAR Exhibit 1 and Ms. Smallwood's cross-examination of Speller at Defendant's trial that Ms. Smallwood wrote the notes admitted as Defendant's MAR Exhibit 1 contemporaneously with any conversation she had with Speller; that the purported conversation took place on the date appearing on the exhibit, i.e., November 20, 2001; or that the conversation ever took place.
Although the court recognized the significance of Ruffin's testimony at the hearing, evidence that Smallwood's time sheet contained no entry for 20 November 2001 and that High did not learn about the conversation until trial both indicated to the court that the conversation never took place.
*316 Regarding defendant's Claim 1(b) (the "exculpatory witness claim"), the trial court concluded that defendant's claim was procedurally barred under N.C. Gen. Stat. § 15A-1419(a) and, alternatively, without merit. Applying the standard set forth in Strickland , 466 U.S. at 687, 104 S.Ct. 2052, the court concluded that defendant could demonstrate neither deficient performance nor prejudice based upon Smallwood's failure to withdraw and *58 testify as a witness. And to the extent Sullivan , 446 U.S. at 350, 100 S.Ct. 1708, applied to defendant's exculpatory witness claim, the court concluded that the claim was still meritless because he "failed to present evidence establishing that any actual conflict of interest existed which had an adverse effect on Ms. Smallwood's representation of defendant."
Defendant filed a petition for writ of certiorari, which we allowed, seeking review of the trial court's order denying his MAR. Defendant contends that (1) he was not procedurally barred from raising the exculpatory witness claim and, alternatively, any failure to properly assert the claim in Hyman I was due to ineffective assistance of appellate counsel; (2) he was not procedurally barred from raising the dual representation claim and, alternatively, any failure to properly assert the claim in Hyman II was due to ineffective assistance of counsel owing to Warmack's conflict of interest; (3) the trial court's material factual findings were entered pursuant to an incorrect evidentiary standard and are not supported by the evidence; and (4) defendant was denied his right to effective assistance of counsel and is entitled to relief under Sullivan or, alternatively, under Strickland .
II. Discussion
We review the trial court's rulings on motions for appropriate relief "to determine 'whether the findings of fact are supported by evidence, whether the findings of fact support the conclusions of law, and whether the conclusions of law support the order entered by the trial court.' " State v. Frogge , 359 N.C. 228, 240, 607 S.E.2d 627, 634 (2005) (quoting State v. Stevens , 305 N.C. 712, 720, 291 S.E.2d 585, 591 (1982) ). The trial court's findings of fact "are binding on appeal if they are supported by competent evidence." State v. Morganherring , 350 N.C. 701, 714, 517 S.E.2d 622, 630 (1999). The trial court's conclusions of law, however, " 'are fully reviewable on appeal.' " State v. Lutz , 177 N.C.App. 140, 142, 628 S.E.2d 34, 35 (2006) (quoting State v. Wilkins , 131 N.C.App. 220, 223, 506 S.E.2d 274, 276 (1998) ).
A.
We first address whether the trial court erred in applying a procedural bar to defendant's exculpatory witness claim.
N.C. Gen. Stat. § 15A-1419(a) (2015) provides four grounds for the denial of a motion for appropriate relief, including: "Upon a previous appeal the defendant was in a position to adequately raise the ground or issue underlying the present motion but did not do so." N.C. Gen. Stat. § 15A-1419(a)(3). Where such grounds exist, the trial court must deny *59 the motion unless the defendant can show (1) "good cause for excusing the grounds for denial" and "actual prejudice resulting from the defendant's claim"; or that (2) the "failure to consider the defendant's claim will result in a fundamental miscarriage of justice." N.C. Gen. Stat. § 15A-1419(b) (2015).
The statute clarifies that "good cause" exists only where "the defendant establishes by a preponderance of the evidence that his failure to raise the claim or file a timely motion was," among other reasons, due to "ineffective assistance of trial or appellate counsel." N.C. Gen. Stat. § 15A-1419(c)(1) (2015). And to demonstrate "actual prejudice," the defendant must show "by a preponderance of the evidence that an error during the trial or sentencing worked to the defendant's actual and substantial disadvantage, raising a reasonable probability, viewing the record as a whole, that a different result would have occurred but for the error." N.C. Gen. Stat. § 15A-1419(d) (2015). Finally, the trial court's failure to consider the otherwise barred claim results in "a fundamental miscarriage of justice" only if "[t]he defendant establishes that more likely than not, but for the error, no reasonable fact finder would have found the defendant guilty *317 of the underlying offense." N.C. Gen. Stat. § 15A-1419(e)(1) (2015).
The trial court concluded that defendant's claim was procedurally barred under N.C. Gen. Stat. § 15A-1419(a)(3). In the record on appeal in Hyman I , defendant included the following assignment of error:
10. Defendant was denied the assistance of counsel because his attorney failed to withdraw from representation when it became apparent that she had a conflict of interest.
The trial court viewed defendant's tenth assignment of error as "a clear indication that defendant contemplated arguing an ineffective assistance of counsel claim based upon Ms. Smallwood's failure to withdraw and testify." In his appellate brief, however, defendant "did not identify what he is now squarely raising in Claim 1(b) as a ground for reversal on appeal." While "defendant made references in the body of his brief to Ms. Smallwood's failure to withdraw and testify," he did so under the following assignment of error: "The trial court erred in failing to conduct a hearing when the court became aware of a conflict of interest on the part of one of defendant's attorneys who had previously represented Derrick Speller, one of the State's witnesses." The trial court concluded, therefore, that defendant's claim was procedurally barred because he was in a position to adequately raise his claim in Hyman I but failed *60 to do so. The court further concluded that because defendant's claim was meritless, "the procedural bar has not been excused pursuant to N.C.G.S. § 15A-1419(b) by showing good cause and actual prejudice, or that a fundamental miscarriage of justice would occur for this Court's failure to review the barred claim."
An examination of defendant's "references" to the exculpatory witness claim within his first appellate brief, alluded to by the trial court, reveals the extent to which defendant attempted to raise the claim on appeal in Hyman I :
Defense counsel Smallwood had a conflict of interest in that she was in possession of information which could be used to impeach Derrick Speller, one of the State's most crucial witnesses. This information consisted of statements he made to her implicating Demetrius Jordan and exonerating Defendant, which directly contradicted his testimony at trial. Although she chose to remain as counsel and used the information she acquired in her representation of Speller to impeach his testimony, rather than withdrawing as counsel and testifying as a witness, it is not at all clear that this was the correct decision. It is certainly arguable that the information she had to impart would have carried more weight had she been on the stand testifying under oath. Nor is it clear that Defendant was aware of the conflict and had acquiesced in counsel's actions.
Reviewing defendant's brief with the benefit of hindsight, it would have been more helpful had defendant argued his claim pursuant to the tenth assignment of error. Nevertheless, the foregoing excerpt from his brief and a fair reading of the cases cited for support therein, see, e.g. , State v. Green , 129 N.C.App. 539, 551-52, 500 S.E.2d 452, 459-60 (1998) (holding that trial court properly conducted an inquiry into conflict of interest owing to counsel's decision not to pursue line of questioning which could have required counsel himself to withdraw and testify), indicates that the Court could have addressed the claim as it was presented despite the formerly rigid rule of appellate procedure requiring assignments of error. While perhaps unartfully, defendant adequately raised the exculpatory witness claim when he was first in a position to do so. That the issue was never explicitly addressed thereafter-for whatever reason-should not bar defendant's claim under N.C. Gen. Stat. § 15A-1419(a), and the trial court erred in concluding otherwise.
*61 B.
Next, we address defendant's challenge to the trial court's material factual findings regarding the conversation between Smallwood and Speller.
The trial court found that defendant offered no credible evidence at the MAR hearing that Smallwood transcribed the handwritten notes contemporaneously with any conversation she had with Speller, that the *318 purported conversation took place on 20 November 2001, or that the conversation ever took place. Based solely upon Smallwood's notes and her cross-examination of Speller at trial, the court also could not "definitely find" any of the foregoing had occurred, implying that Smallwood fabricated the evidence at trial. Relying on these findings, the court concluded that there was no evidence to support defendant's exculpatory witness claim.
At an evidentiary hearing on a motion for appropriate relief, "the moving party has the burden of proving by a preponderance of the evidence every fact essential to support the motion." N.C. Gen. Stat. § 15A-1420(c)(5) (2015) (emphasis added). As defendant points out, therefore, he was not required to "definitely" prove that Smallwood transcribed the handwritten notes contemporaneously with any conversation she had with Speller, that the purported conversation took place on 20 November 2001, or that the conversation ever took place. More importantly, that the court was unable to "definitely find" any of the foregoing occurred is not dispositive of defendant's exculpatory witness claim.
It is undisputed that, at the time of defendant's trial, Smallwood possessed evidence tending to show that Speller made a prior inconsistent statement concerning the identity of the shooter. The exculpatory witness claim raised in defendant's MAR was whether Smallwood's failure to withdraw and testify as to that alleged prior inconsistent statement constitutes ineffective assistance of counsel. Evidence that Smallwood was privy to a conversation in which Speller identified the shooter as someone other than defendant would have been both relevant and material had it been offered at trial. Admissibility is, of course, a separate issue but one that does not depend upon a preliminary finding by the court that a witness's testimony is credible. See N.C. Gen. Stat. § 8C-1, Rule 104(e) (2015) ("This rule does not limit the right of a party to introduce before the jury evidence relevant to weight or credibility.").
If otherwise competent, therefore, Smallwood's testimony would have been admissible and within the purview of the jury to assign weight *62 and credibility thereto. See State v. Scott , 323 N.C. 350, 353, 372 S.E.2d 572, 575 (1988) ("The credibility of the witnesses and the weight to be given their testimony is exclusively a matter for the jury." (citing State v. Wilson , 293 N.C. 47, 235 S.E.2d 219 (1977) )); State v. Gamble , --- N.C.App. ----, ----, 777 S.E.2d 158, 165 (2015) ("The witness's credibility is a matter for the court when the only testimony justifying submission of the case to the jury is inherently incredible and in conflict with [the proponent's] own evidence." (citations and internal quotation marks omitted)). The jury could have believed Smallwood's testimony, in which case her failure to withdraw and testify would tend to support defendant's claim for ineffective assistance of counsel. Because the trial court's findings were not germane to the adjudication of defendant's exculpatory witness claim, they do not support its conclusion that defendant's claim is meritless for lack of evidentiary support.
C.
Next, we address the substance of defendant's exculpatory witness claim and his challenge to the trial court's conclusions that he received effective assistance of counsel despite Smallwood's failure to withdraw and testify at trial.
Defendant maintains that he received ineffective assistance of counsel due to Smallwood's failure to withdraw as counsel and testify as to Speller's alleged prior inconsistent statement regarding the identity of the shooter. In her role as counsel, Smallwood's questions on cross-examination could not be considered evidence by the jury. Therefore, defendant argues, when Speller denied the prior inconsistent statement during cross-examination, Smallwood had an actual conflict of interest between continuing as counsel or withdrawing to testify as a necessary witness. Defendant contends that because Smallwood's actual conflict of interest adversely affected her performance as counsel, he is entitled to relief under Sullivan , 446 U.S. at 348, 100 S.Ct. 1708. Alternatively, defendant claims he is entitled to relief under Strickland , 466 U.S. at 687, 104 S.Ct. 2052, because Smallwood's decision to remain as counsel fell below an objective standard of reasonableness and prejudiced his defense.
*319 A criminal defendant's Sixth Amendment right to counsel means "the right to the effective assistance of counsel." McMann v. Richardson , 397 U.S. 759, 771 n.14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970). Effective assistance of counsel includes a "right to representation that is free from conflicts of interest." Wood v. Georgia , 450 U.S. 261, 271, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981) (citations omitted). In counsel's role, he or she owes the client a duty of loyalty, which is "perhaps the most basic of counsel's duties." Strickland , 466 U.S. at 688, 692, 104 S.Ct. 2052.
*63 To prevail on a claim of ineffective assistance of counsel, a defendant typically must show that "counsel's performance was deficient" and "the deficient performance prejudiced the defense." Id. at 687, 104 S.Ct. 2052 ; see also State v. Braswell , 312 N.C. 553, 562-63, 324 S.E.2d 241, 248 (1985) (adopting the standard set forth in Strickland to review claims of ineffective assistance of counsel under the North Carolina Constitution). The U.S. Supreme Court has applied a different standard, however, to review claims of ineffective assistance of counsel based upon a conflict of interest. Sullivan , 446 U.S. at 349-50, 100 S.Ct. 1708. Under Sullivan , a defendant who "shows that his counsel actively represented conflicting interests" and that "conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." Id. ; see also Mickens v. Taylor , 535 U.S. 162, 172-73, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002) ; State v. Choudhry , 365 N.C. 215, 219, 717 S.E.2d 348, 352 (2011). A presumption of prejudice arises because "it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests." Strickland , 466 U.S. at 692, 104 S.Ct. 2052.
The North Carolina Supreme Court has previously addressed whether an attorney's decision not to withdraw and testify as a witness for his client created an actual conflict of interest reviewable under Sullivan rather than Strickland . In State v. Phillips , 365 N.C. 103, 711 S.E.2d 122 (2011), the defendant moved to suppress evidence of his confession because "he was substantially impaired from drugs and alcohol and unable to understand the consequences of his actions when he waived his Miranda rights." Id. at 109-11, 711 S.E.2d at 130-31. The police chief, Gary McDonald, had apparently told the defendant's attorney, Bruce Cunningham, that the defendant was "stoned out of his mind" when he confessed to shooting four people. Id. at 115, 117, 711 S.E.2d at 133, 134. When Cunningham confronted Chief McDonald about the alleged statement on cross-examination and presented handwritten notes of the conversation, Chief McDonald testified that he did not recall making the statement. Id. at 117-18, 711 S.E.2d at 134-35.
The defendant appealed his conviction, arguing that he was deprived of his Sixth Amendment right to conflict-free counsel because Cunningham "failed to withdraw and testify as a witness for defendant, depriving him of conflict-free counsel." Id. at 116-17, 711 S.E.2d at 134. He claimed that "a withdrawal was necessary because attorney Cunningham remembered Chief McDonald making certain statements to Cunningham that Chief McDonald did not himself recall." And because Cunningham could not serve as both an advocate and a necessary *64 witness at trial, see N.C. St. B. Rev. R. Prof. Conduct 3.7 ("Lawyer as a Witness"), 2017 Ann. R. N.C. 1242, Cunningham had an "actual conflict of interest" which entitled the defendant to relief under Sullivan . Id. at 117-18, 711 S.E.2d at 135. Our Supreme Court concluded, however, that the defendant's claim should be reviewed under Strickland :
The applicability of the Sullivan line of cases has been carefully cabined by the United States Supreme Court. "The purpose of our Holloway and Sullivan exceptions from the ordinary requirements of Strickland ... is not to enforce the Canons of Legal Ethics, but to apply needed prophylaxis in situations where Strickland itself is evidently inadequate to assure vindication of the defendant's Sixth Amendment right to counsel." Here, unlike the circumstances posited in Holloway where counsel has been effectively silenced and any resulting harm difficult to measure, defendant has identified the single matter *320 to which attorney Cunningham could have testified had he withdrawn as counsel. Because the facts do not make it impractical to determine whether defendant suffered prejudice, we conclude that Strickland 's framework is adequate to analyze defendant's issue.
Id. at 121-22, 711 S.E.2d at 137 (quoting Mickens , 535 U.S. at 176, 122 S.Ct. 1237 ).
Guided if not bound by Phillips , we believe Strickland provides an adequate framework to review defendant's exculpatory witness claim. Despite Smallwood's prior representation of Speller, the record shows that the purported conversation between Smallwood and Speller "took place from an investigatory standpoint" in preparation for defendant's trial. Because that conversation was outside the scope of her representation, Smallwood would not have bound by a duty of confidentiality. By the same token, Smallwood was not "effectively silenced" from testifying about the conversation and the information she learned from Speller. As the facts of this case do not "make it impractical to determine whether defendant suffered prejudice," Phillips , 365 N.C. at 122, 711 S.E.2d at 137, we apply Strickland 's framework to evaluate defendant's exculpatory witness claim.
As stated above, Strickland requires a defendant to first show that "counsel's performance was deficient." Strickland , 466 U.S. at 687, 104 S.Ct. 2052. To establish deficient performance, the defendant "must demonstrate that counsel's representation 'fell below an objective standard of reasonableness.' " Wiggins v. Smith , 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (quoting *65 Strickland , 466 U.S. at 688, 104 S.Ct. 2052 ); see also State v. Allen , 360 N.C. 297, 316, 626 S.E.2d 271, 286, cert. denied , 549 U.S. 867, 127 S.Ct. 164, 166 L.Ed.2d 116 (2006).
The trial court concluded that defendant could not demonstrate deficient performance because Smallwood's testimony would not have been admissible at trial. And even if it would have been admissible, the court concluded, Smallwood could only have testified that "Demet had a .380" and "[h]e shot the guy and ran out the back door." We disagree.
Our common law rules have restricted the use of extrinsic evidence to impeach the credibility of a witness. As articulated in State v. Stokes , 357 N.C. 220, 581 S.E.2d 51 (2003), a case decided prior to defendant's murder trial, "when a witness is confronted with prior statements that are inconsistent with the witness' testimony, the witness' answers are final as to collateral matters, but where the inconsistencies are material to the issue at hand in the trial, the witness' testimony may be contradicted by other testimony." Id. at 226, 581 S.E.2d at 55 (citing State v. Green , 296 N.C. 183, 192-93, 250 S.E.2d 197, 203 (1978) ); see also 1 Kenneth S. Broun, Brandis & Broun on North Carolina Evidence §§ 159-61 (7th ed. 2011). If the prior inconsistent statement relates to a material matter, then it "may be proved by other witnesses without first calling [it] to the attention of the main witness on cross-examination." Green , 296 N.C. at 193, 250 S.E.2d at 203 (citations omitted). If it is collateral but tends to show bias, motive, or interest of the witness, the inquirer must first confront the witness with the "prior statement so that he may have an opportunity to admit, deny or explain it." Id. ; see also State v. Long , 280 N.C. 633, 639, 187 S.E.2d 47, 50 (1972). If the witness denies making the statement, "the inquirer is not bound by the witness's answer and may prove the matter by other witnesses." Green , 296 N.C. at 193, 250 S.E.2d at 203.
It cannot seriously be disputed that the identity of the shooter was a material issue in defendant's murder trial. Smallwood, who possessed evidence of Speller's prior inconsistent statement regarding the shooter's identity, was not bound to accept Speller's answers on cross-examination. Smallwood's testimony, had it been offered, would have been admissible to impeach Speller by showing that he had previously identified Jordan as the shooter. And contrary to the trial court's conclusion, we do not believe such exculpatory evidence would have been inconsequential so as to justify Smallwood's failure to withdraw.
Smallwood's testimony would have also been admissible to show Speller's bias or interest in the trial. Jordan was initially *321 charged with Bennett's murder and spent two years in jail before he was released. *66 Speller testified that he and Jordan "work[ed] the same job." After the charges against Jordan were dropped, he sent Speller to the district attorney to offer a statement implicating defendant in the murder. The trial court even expressed concern over this aspect of the case during the charge conference:
I think Mr. Jordan's credibility is at issue in this case.... At least one of your witnesses-one of your very key witnesses ... Derrick Speller testified that he came to you as a result of what Demetrius Jordan said to him, if I'm not mistaken. Demetrius Jordan told him to go see you. Had it not been for that he may not even have been involved in the case. So the question is, why is Demetrius Jordan running around rounding up witnesses for the State.
At the same time ... you have a situation where the State of North Carolina has dismissed very serious cases against Mr. Jordan-a case of second-degree murder-and allowed him to plea to something much less to the point where he is now out of jail....
Speller testified at trial that he never gave a statement to police because "nobody never asked me." That explanation was different than what Smallwood had dictated in her notes: "[Speller] never gave a statement to the police because he hustled for Demet and Turnell and them niggers are lethal."
While the admissibility of Smallwood's testimony does not in and of itself establish deficient performance, the circumstances surrounding her decision to remain as counsel leads us to that conclusion. Smallwood was the only witness to Speller's prior inconsistent statement. Her questions to Speller could not be considered as evidence and, after her ineffective cross-examination, she became a necessary witness at trial with a duty to withdraw. See N.C. St. B. Rev. R. Prof. Conduct 3.7(a) ("A lawyer shall not act as an advocate at a trial in which the lawyer is likely to be a necessary witness...."), 2017 Ann. R. N.C. 1242. Her testimony undoubtedly related to a contested issue in the case and tended to discredit one of the State's two key witnesses. High could have remained as defendant's counsel and the court could have appointed a second attorney even if it meant declaring a mistrial. By failing to withdraw and testify, Smallwood's conduct fell below an objective standard of reasonableness and was deficient under Strickland .
Next, we address whether defendant satisfied the requisite showing of prejudice for relief under Strickland . To show prejudice, a "defendant *67 must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland , 466 U.S. at 694, 104 S.Ct. 2052.
The trial court concluded that defendant could not establish prejudice in light of Smallwood's "effective cross-examination" of Speller, Wilson's testimony, and the State's cross-examination of D. Pugh based upon his prior inconsistent statement to law enforcement. We disagree.
If Smallwood had properly withdrawn, she could have testified that Speller, one of only two key witnesses for the State, had previously told her that it was Jordan-not defendant-who shot Bennett. She could have attacked Speller's credibility through his prior inconsistent statement and evidence of his interest in the trial. Her testimony tended to discredit nearly half the State's case and, in conjunction with the testimony of L. Pugh and D. Pugh, would have provided an evidentiary advantage to the defense.
Wilson, the only other witness to identity defendant as the shooter, had his own credibility issues. He had testified as a State's witness in the past and, during defendant's trial, revealed that he had been convicted of breaking and entering, two counts of second-degree burglary, larceny of a firearm, larceny of a motor vehicle, four counts of driving while license revoked, four counts of driving while impaired, two counts of injury to property, communicating threats, assault with a deadly weapon, and forgery and uttering-all within the last ten years . Judge Grant *322 even remarked at the MAR hearing: "We all know Robert Wilson.... And a record like that, right, we know him."
The State's cross-examination of D. Pugh also does not foreclose a showing of prejudice. D. Pugh denied making a prior inconsistent statement to police, asserting that when he was arrested days after the murder on unrelated charges, police gave him a blank sheet of paper to sign and initial, which he did, and they later wrote out a statement implicating defendant. The statement was not introduced at trial, and despite the State's cross-examination, D. Pugh's testimony implicating Jordan as the shooter would nevertheless have bolstered Smallwood's impeachment evidence against Speller.
Finally, we agree with defendant that, as a practical matter, Smallwood's testimony could have rehabilitated her own credibility as an advocate at trial, which has been described as "[a] cardinal tenet of successful advocacy." State v. Moorman , 320 N.C. 387, 400, 358 S.E.2d 502, 510 (1987). Even from a cold record we can tell that Smallwood's *68 cross-examination was, in defendant's own words, "disastrous." Speller denied her every attempt to establish that he had given a prior inconsistent statement or that their conversation took place. His steadfast repudiation bolstered his own credibility and impeached Smallwood's credibility as an advocate. In a case that came down to the credibility of the witnesses, there is a reasonable probability that, had Smallwood withdrawn and testified as to Speller's prior inconsistent statement, the result would have been different.
III. Conclusion
We conclude that defendant was denied his right to effective assistance of counsel based upon Smallwood's failure to withdraw and testify as a necessary witness at trial. Because defendant is entitled to relief under Strickland on his exculpatory witness claim, we need not address his remaining arguments to this Court. The trial court's order denying his MAR is reversed.
REVERSED.
Judge HUNTER, JR. concurs.
Judge DILLON dissents by separate opinion.

The State and defendant had both consented to a change of venue from Bertie County to Hertford County.